97 N.J. Super. 360 (1967)
235 A.2d 195
JOSEPH M. DAVID, APPELLANT,
v.
JUNE STRELECKI, DIRECTOR OF MOTOR VEHICLES, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1967.
Decided October 24, 1967.
*363 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Patrick T. McGahn, Jr., argued the cause for appellant.
*364 Mr. Joseph A. Hoffman, Assistant Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Alan D. Kirby, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KILKENNY, J.A.D.
On February 24, 1967, the Director of the State Division of Motor Vehicles (hereinafter "Director"), following an administrative hearing, found that Joseph M. David drove his automobile on August 24, 1965 in Egg Harbor Township carelessly, in violation of R.S. 39:4-97, failed to drive upon the right half of the highway, in violation of R.S. 39:4-82, and operated the motor vehicle after consuming alcoholic beverages, which consumption of alcohol beverages affected his ability to operate the automobile properly and safely, and that these violations caused an accident to occur which resulted in the death of Charles Teti. The Director ordered David's driving privilege suspended for a period of two years.
David appeals from this final decision, pursuant to R.R. 4:88-8. We stayed suspension of his driving privilege pending determination of the appeal.
David contends that evidence suppressed by the County Court in a criminal proceeding stemming from this same accident should not have been admitted at the administrative hearing and could not properly form a basis for the Director's action, especially since such evidence was obtained in a custodial setting while he was under sedation. He also maintains that the findings of fact were not supported by adequate admissible evidence to warrant suspension of his driving privilege.
The happening of the accident itself, with its fatal consequences, and the physical aspects thereof, are not in dispute. On August 24, 1965, a clear, dry day, at about 2:20 A.M., David was driving his automobile in a westerly direction on Somers Point Road in Egg Harbor Township, Atlantic County. At a very sharp curve in the road, at a point where *365 the road passes over Powell Creek, the vehicle left the roadway, traveled 58 feet on the shoulder thereof as evidenced by tire marks on the shoulder only, struck and tore away a 20-foot section of guardrail, then traveled 162 feet further along the shoulder, overturned down an embankment, striking several trees as it turned over and down the embankment, and finally came to rest on its side. Charles Teti, a riding companion of David, was killed in the accident. The automobile was extensively damaged, the rear axle was broken and the left rear tire and wheel were never recovered.
There were no eye witnesses to the accident other than David as driver and his friend Teti, who had been riding on the passenger's side of the front seat. David climbed out of the car to go for help, went to a house about 300 yards up the street, and there either he or an occupant of the house called the police. The police arrived at about 2:45 A.M. At that time the rescue squad was removing Teti from the vehicle. Both he and David were taken by ambulance to Somers Point Hospital.
When Trooper Porter of the State Police, who investigated the accident, arrived at the hospital at about 5 A.M., after having made a partial investigation at the scene, he was informed by the nurse in the emergency room that Teti was dead. His lips were thus sealed by death. Prior to the police officer's arrival David, who had been suffering apparently greatly from shock as the result of the accident, had been given sedatives  a pill and an injection. He was asleep when the trooper arrived. The nurse awakened him and the trooper began to question him forthwith, knowing then from the fact that Teti was dead and the information gathered by him at the scene that David faced a possible charge of manslaughter by automobile, N.J.S. 2A:113-9, as well as charges for violating the Motor Vehicle Act, and their serious consequences. The questioning was pursued by this police officer even though, as he frankly admitted, David was in a "groggy" condition, but "not drunk," and was under *366 sedation and "incoherent" in his responses, and without any advice or warning being given to David as to his rights to remain silent, to have counsel and the like. In fact, this same police officer swore to a complaint against David for manslaughter by automobile, N.J.S. 2A:113-9, on the following day. We shall discuss hereinafter the particular inculpatory admissions as to speeding and beer drinking allegedly made orally by David in the hospital emergency room to this trooper and the use of this evidence by the Director as a basis for her findings.
On the following day, August 25, 1965, at about 10:37 A.M., another police officer, Detective Heilfurth, picked up David at the hospital, brought him to State police headquarters at Mays Landing and there, while this shocked individual was still under sedation from a hospital-administered "needle and a pill," took a signed written statement from him. David again made incriminating admissions therein as to speeding and beer drinking. Here again, no specific warning or advice was given to him by this police officer as to his right to remain silent, or that the statement might be used against him. The statement, however, contains a recital that he was advised that the statement must be voluntary and he had a right to consult an attorney before giving the statement. He was apparently not advised that the State would furnish an attorney if he wanted one and was unable to engage his own. Thus some, but not all of the warnings specified in Miranda v. State of Arizona, 384 U.S. 436 (1966), were given. This statement, with its pertinent particulars hereinafter noted, was also used by the Director as another basis for her findings.
When David was thereafter indicted for a violation of N.J.S. 2A:113-9, his attorney moved in the Atlantic County Court before Judge Francis in August 1966 to suppress the oral statement given by David to Trooper Porter at the hospital and also to suppress the written statement of David taken by Detective Heilfurth on August 25, 1965 when David, as this officer expressed it, was "theoretically *367 under arrest," although not "formally" so in those "exact words." He was then in the custody of the police at headquarters whence he had been taken as aforesaid.
Judge Francis took the testimony of the police officers in connection with the motion to suppress and on the basis thereof granted the motion. He found that the warnings expressed in Miranda v. State of Arizona, supra, decided June 13, 1966 before the hearing of the motion, had not been given by either police officer, and that David was in a "custodial setting" when the statements were obtained, considering all of the attendant circumstances. Moreover, Judge Francis found that the evidence of sedation  present when both statements were taken, albeit apparently more so in the case of the initial oral statement when David was admittedly incoherent  precluded admissibility under the cases prior to Miranda.
The State did not seek leave to appeal the order suppressing the two statements to the police. Instead, in the face of an absence of adequate proof to establish the charge in the indictment, an order was entered on the State's own motion dismissing the indictment without any trial.
The Director went forward with the administrative hearing to suspend David's driving privilege, notwithstanding dismissal of the indictment. The Director had a right to do so notwithstanding a disposition of the criminal proceedings in the motorist's favor. Atkinson v. Parsekian, 37 N.J. 143, 151 (1962). Over the objection of David's attorney, Trooper Porter and Detective Heilfurth testified before the Division hearer as to what David had told them. Their testimony included the admissions of speeding and beer drinking allegedly made by David in the respective oral and written statements. It is abundantly clear from the Director's decision that she relied substantially upon this evidence, previously suppressed by order of the County Court, as well as upon the police testimony as to the physical aspects of the accident in her findings. For example, the Director uses as a basis for a finding of speeding that David *368 told Trooper Porter that "he was proceeding at a speed of 90 miles an hour or more before the accident occurred." Again, she relied heavily upon David's having told the police officers that he had consumed four or five beers some hours before the accident, in her finding that David's ability to drive his car safely had been impaired by his having consumed alcoholic beverages.
Generally, there is no necessity at administrative hearings to apply the rules of evidence strictly. Inadmissible evidence may creep into the record but its presence does not ipso facto mandate a reversal of the administrative determination, as might be the result in a judicial proceeding tried before a jury. However, administrative decisions must be based on admissible, competent and substantial evidence in the record. As a corollary thereto, if the administrative determination lacks legal support and is based upon inadmissible, incompetent or nonsubstantial evidence, it lacks validity.
Procedural due process of law is guaranteed to every person by the Fifth and Fourteenth Amendments to the United States Constitution. The Fifth insures against action by the Federal Government, and the Fourteenth against action by the State or its agencies. Procedural due process is not limited to criminal proceedings. It is equally applicable to civil proceedings, including administrative hearings. Weaver, Constitutional Law (1946), § 286, p. 420. A revocation or suspension of driving privileges is deemed to be civil in nature. But its result can be a deprivation of liberty and of the property rights in a license to drive an automobile. Bechler v. Parsekian, 36 N.J. 242, 257 (1961). As we stated in Parsekian v. Cresse, 75 N.J. Super. 405, 411 (App. Div. 1962):
"The fact remains that today the very livelihood of a man and his family may depend on his license."
*369 David's need to have a driver's license to commute expeditiously to his place of employment as an ironworker was recognized by the Director in her decision.
While suppression by the County Court of the statements made by David to the two police officers in connection with a criminal proceeding is not automatically binding at the administrative hearing, the rationale which prompted the suppression ought not to be lightly disregarded. Judge Francis properly ruled that the evidence of David's having received sedatives and of his "incoherence" justified exclusion of statements made by him while in such a condition upon the basis of decisions long prior to Miranda. This was a recognition that procedural due process requires any hearing, judicial or quasi-judicial, to possess the element of fundamental fairness. For example, it would be fundamentally unfair and violative of procedural due process to try a man for drunken driving speedily while he is still drunk, even though defendant's then presence before the magistrate would leave no doubt as to his condition. See, too, Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1965), in which the incriminating evidence was literally pumped from the person's innards.

I
The testimony of Trooper Porter as to the results of his questioning David in the hospital emergency room should have been excluded at the administrative hearing as a matter of fundamental fairness. Its admission was violative of procedural due process. It was prejudicial and reversible error for the Director to have relied upon this testimony as a basis for her findings.
The Trooper admitted that he knew from talking with the nurse that David had been given sedatives by her in the hospital emergency room, was asleep when he arrived and was awakened by the nurse for questioning by him in the emergency room. In the words of this witness, "He was a *370 bit groggy after having been awakened." Admittedly, no warning or advice was given to this young man as to his rights to remain silent and to have counsel.
It may be that the Director did not have before her the full record which has been presented to us and which includes this trooper's testimony before the local magistrate and before Judge Francis. The Director makes no objection to the inclusion thereof in the appendix and we have, of course, examined the same in the exercise of our original jurisdiction. New Jersey Constitution of 1947, Art. VI, Sect. V, par. 3.
Before the magistrate the trooper frankly stated:
"I was trying to get a statement from him at that time, but I saw that he was  I didn't feel that he actually knew what he was talking about at that time. He said he was going over 90 miles an hour at the time of the accident, and I knew that he wasn't going to stick with that later on, so I didn't question him further." (Emphasis added.)
Before Judge Francis in the County Court Trooper Porter described David at the emergency room questioning as "slightly incoherent, because he didn't seem to be aware of the situation at that time." And again, "he was sort of mumbling."
Even though the trooper immediately abandoned all further questioning of David once he said he was going "over 90 miles an hour," simply because, as the trooper expressed it, "I didn't think he was in any condition," the Director accepted David's alleged admission of such excessive speeding as a basis for concluding that he drove at such a high rate of speed. Fundamental fairness required rejection, as an evidentiary support for a license suspension, of admissions made by a person during a period of sedation which had produced incoherency in the declarant and an awareness in the questioner, "I didn't feel that he actually knew what he was talking about at that time."

*371 II
In the written statement given by David to Detective Heilfurth at the State Police Barracks in Mays Landing on the morning of August 25  which statement had also been suppressed by the County Court, as aforesaid  David stated that he could not estimate how fast he was going just before he hit the side of the road, "but I knew I was going over the speed limit." The speed limit was not specified. He also admitted that he had "about 3 beers, 4 beers" at Tony Mart's  "12 ounce bottles," and that he and his two friends had consumed a "six-pack" prior to going to Tony Mart's. He did not, according to the statement, remember what caused the accident.
When asked at the time of the statement if he was "presently under medication," David had answered, "They gave me a needle and a pill at the hospital. I don't know what they were, they said they would calm my nerves."
At the administrative hearing David did not remember giving this statement, or the earlier oral statement to Trooper Porter. He testified that he was proceeding within the speed limit of 50 miles per hour and not driving in a careless and heedless manner at the time and place in issue.
Even were we to deem this written statement admissible at the administrative hearing  it was admitted in evidence over objection and relied upon by the Director in her decision  its probative value was far outweighed by the other evidence in the case. The finding by the Director, that David's ability to drive his automobile safely and properly was impaired, was not justified upon the basis of the entire record, as hereinafter noted. Moreover, the statement, unsworn in character, was taken when David was under sedation and did not remember giving it. Any admission therein as to speed was contradicted by his sworn testimony at the hearing that he was traveling within the 50-mile speed limit.
We find it unnecessary herein to decide whether the constitutional guarantee against self-incrimination, as defined in *372 Miranda v. State of Arizona, supra, extends beyond the realm of purely criminal proceedings to civil forfeitures, such as the loss of a license to drive an automobile. But see Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), a disbarment proceeding, and Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), as to the right of a policeman to invoke the Fifth Amendment under threat of a loss of his position, if he does so.

III
The Director's finding that David's consumption of alcoholic beverages "did affect his ability to properly and safely operate said motor vehicle" is not supported by any substantial evidence in the record. The conclusion is a mere "Post hoc, ergo propter hoc." On the contrary, there was substantial credible evidence that the few beers consumed by David had not impaired his ability to drive properly and safely.
The only evidence as to David's drinking consisted of the following. In the inadmissible statement to Trooper Porter in the hospital emergency room David told the trooper that "he had had a few drinks down in the bars around the Somers Point area." The trooper said that David "smelled of alcohol also," but he was "not drunk." In the written statement taken by Detective Heilfurth, David asserted that he and two friends, sometime between 10:30 P.M. and 12 midnight, had consumed a "sixpack" of beer before going to "Tony Marts" at the Point. The three of them were at "Tony Marts" from about midnight until about 1 P.M., during which time he had "about 3 beers, 4 beers,"  12-ounce bottles.
On the other hand, Sergeant Bader of the Somers Point police testified that he saw David at about 1:15 A.M. on August 24, 1965 at the City Hall in Somers Point  estimated by him to be about six miles from the scene of the fatal accident  and talked with him until David left City *373 Hall between 1:45 and 2 A.M. According to this police officer, who incidentally is a qualified drunkometer operator, David was not drunk. As he put it, "He might have had a drink or two but he was not under the influence, no, sir." He stated that if David were under the influence at that time, he would not have let him go out and get in his automobile and drive off. He answered, "No, sir," to an inquiry as to whether in his opinion any of David's faculties were impaired at that time to render him unable to operate a motor vehicle safely.
Sergeant Bader had met David and his two friends outside of Tony Mart's cafe about 1:15 A.M., having gone there in response to a radio dispatcher's call that there was some trouble down there. When he arrived at the cafe the sergeant ascertained that the three had wanted to go inside and were not permitted for some unknown reason. In all events, the three went with the sergeant to City Hall and after some conversation there they went on their way. This police officer, in answer to the hearing officer's question, reiterated that as to physical condition David gave no impression that he had been drinking alcoholic beverages, except for "a slight odor of alcohol on his breath." He testified that David's "attitude in speech and everything was very clear."
Further evidence that David's faculties were not impaired by the consumption of the beers consisted of the testimony of Leo T. Clark, a private investigator who had retired from the F.B.I. after 22 years service as a special agent. He checked the distance from the Somers Point City Hall to the scene of the accident and found it to be 7.6 miles. In traversing that distance there are 18 curves. Obviously, David had negotiated all of these curves safely until the last one. When Clark questioned David on August 27, 1965, David told him that he had dropped off one of his friends before the accident, merely pulling up in front of the house to do so. In response to a question by the State's attorney on cross-examination, Clark further testified:
*374 "He [David] told me at that time that he thought the left tire blew, because he said the car suddenly went out of control and he was unable to keep the car on the road; that it veered over to the left, and he said that he was aware of the fact that the car began to bang against things * * *."
We can appreciate that the Director had a feeling that the consumption of alcohol may have played a part in the accident. But to reach the conclusion that it did upon the paucity of proof herein  that David had consumed five or six beers over a period of two or three hours before 1 P.M. and none thereafter  would require a complete discounting of Sergeant Bader's testimony, the evidence of the safe negotiation of 17 curves before the mishap, and the plausible explanation that a tire blowout had caused David to lose control of the car.

IV
The Director found that the credibility of David was impaired by his testimony at the hearing when, after testifying that he was traveling west at the time and place in issue within the 50-mile speed limit and not in a careless and heedless manner, David swore that he "didn't remember" what happened. He did not remember having made the statements testified to by the two police officers. His explanation was that he had received an injury to his head and, as he put it, "my head has been bothering me ever since the accident." He now has dizzy spells. The Director noted that David apparently remembered a few days after the accident when he furnished details to the investigator hired in his behalf, Mr. Clark.
Appellate courts must defer, as a general rule, to the better opportunity of the trier of the facts to observe the demeanor of the witnesses and to adjudge of the credibility of any witness. Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 424 (1961). However, the Director's appraisal of David's credibility was not based upon his having testified before her personally. Therefore, we are under no mandate *375 to defer to her assessment of credibility in place of our own. The hearing officer did not evaluate the credibility of any witness. Moreover, his report and the final decision of the Director do not evaluate the evidence offered in David's behalf or controvert it.
There was proof by an employee of the owner of the wrecker which towed away David's automobile from the scene that the left tire and wheel could not be found, even after a search had been made. Their absence lends further plausibility to the tire blowout as the effective cause of the accident.
We conclude that there was not sufficient competent and substantial evidence offered to sustain the State's burden of proving by a preponderance of the evidence that David drove his automobile carelessly and on the wrong side of the highway in violation of the Motor Vehicle Act, or while his ability to drive was impaired by reason of the consumption of alcoholic beverages.
The order of the Director suspending David's driving privilege for two years is reversed.
CARTON, J.A.D. (dissenting).
In my view there was substantial evidence in the whole record from which the Director of Motor Vehicles could reasonably conclude, as she did, that at the time of the accident which resulted in Teti's death David operated the automobile in a careless manner (R.S. 39:4-97), and that he failed to drive upon the right-hand side of the highway (R.S. 39:4-82). The suspension of appellant's driving privileges for some period of time was consequently warranted and the determination to this effect should not be disturbed on appeal. Atkinson v. Parsekian, 37 N.J. 143, 149 (1962).
However, since it may be debatable whether there was sufficient evidence to support the additional finding that appellant's consumption of alcoholic beverages affected his ability to operate the automobile properly and safely, and since the order of suspension does not indicate to what extent *376 it relies on each of the individual findings, I would remand the matter to the Director for the purpose of imposing a suspension consonant with the first two findings.
Let us briefly review the evidence before the Director to ascertain whether there was substantial evidence which a reasonable mind must accept as adequate to support her conclusions. During the evening of August 23, 1965, appellant David was driving a Pontiac Le Mans in the Bridgeton area accompanied by several acquaintances. Between 10:30 P.M. and midnight, David and his passengers, Charles Teti and Danny Peterson, consumed a six-pack of beer. At about midnight, they drove toward Somers Point. On the way they stopped at Patcong Inn where he and Danny Peterson consumed more beer. At Somers Point David consumed between three and four 12-ounce bottles of beer at a tavern called Tony Mart's.
At about 1:15 that morning officer Lyn Bader of the Somers Point Police was dispatched to Tony Mart's to investigate a disturbance. This officer testified that upon arriving he observed David and two of his friends standing outside in an excited condition. He took the boys to the parking lot near the building and talked with them a short while. At the police officer's request, they accompanied him to the City Hall, Peterson driving appellant's car. According to Bader, appellant and his two friends appeared "perturbed" and "excited" because they were not permitted entry into Tony Mart's tavern. He talked further with them and then released them after they "calmed down." Officer Bader expressed the opinion that at that time appellant was not under the influence of alcohol. However, he also commented that David "might have had a drink or two."
On leaving Somers Point, appellant drove Peterson to his home. After dropping him off, accompanied by Charles Teti in the front seat on the passenger side, he drove in a westerly direction approximately a mile and a half to two miles on County Road No. 559. He then failed to negotiate a sharp curve and the car went off the south side of the road *377 at a point where the road passes over Powell Creek. The vehicle traveled 58 feet along the shoulder of the road, tore away a 20-foot section of the guardrail, then traveled 162 feet along the shoulder and overturned down an embankment. The car was completely turned around, and it was lying on its side, and Charles Teti was lying in the car with his head outside. The appellant climbed out of the car to go for help and went to a house approximately 300 yards away. The occupants called the police at his request. The accident occurred at approximately 2:20 A.M. on August 24, 1965, and the weather and road conditions were described as "clear and dry." The accident resulted in the automobile being "wrecked." The rear axle was broken and the left rear tire and wheel were never recovered.
Appellant was taken to the Somers Point Hospital where he was given sedatives. He was discharged from the hospital on the morning of August 25. Detective Heilfurth of the New Jersey State Police met him at that time and took him to the May's Landing State Police Station where the appellant made a written statement consisting of three typewritten pages.
In that statement, which contains the notation that it was begun at 10:37 and completed at 11:25 A.M., David described, largely in narrative form and in considerable detail, the events leading up to the accident and his actions thereafter. After taking Danny Peterson home, he stated:
"* * * From there we headed home, because Charley had to go to work the next day, and I tried to hurry because Charley had to get some sleep, he had to go to work at 5:00 o'clock then the next thing I remember was the accident.
Q. Do you know how the accident happened?
A. The only thing I remember is hitting the side of the road, then the car started going into a spin and hitting things.
Q. Can you estimate how fast you were going just before you hit the side of the road?
A. I couldn't estimate the speed, but I know I was going over the speed limit, I know that.
Q. Are you familiar with the Somers Point-Mays Landing Rd.?
A. Very familiar." (Emphasis supplied)
*378 Appellant's admissions that just before he hit the side of the road he was trying to hurry, that he was exceeding the speed limit, and that he was very familiar with the road, coupled with the physical evidence that the car traveled on the shoulder of the left side of the road, then tore away a 20-foot section of guardrail and traveled another 162 feet along the shoulder before overturning down the embankment, certainly warranted, if not compelled, the finding of careless driving and failure to drive on the right-hand side of the road.
The evidence in support of the finding that appellant's consumption of alcoholic beverages affected his ability to operate the automobile properly and safely is less compelling. The record does show that between 10:30 P.M. and 2:20 A.M., when the accident occurred, he consumed a not inconsiderable quantity of beer. Before midnight he had shared with his two companions a six-pack of beer, about midnight at the Patcong Inn he consumed more beer in an undisclosed quantity, and thereafter at Tony Mart's tavern he drank still more beer to the extent of three or four 12-ounce bottles. These admitted facts as to his drinking that night and his further admission that he could recollect none of the circumstances as to why or how the car he was driving left the road, as well as the physical evidence at the scene of the tragedy pointing to the conclusion that the car was proceeding at a high rate of speed and that he had lost control of it, give rise to more than a mere suspicion that the consumption of alcoholic beverages was an ingredient in causing the accident.
However, the absence of testimony as to whether or not appellant had also eaten any food during the same period, the lack of testimony as to the alcoholic content of the beverages which were consumed, as well as the opinion expressed by Officer Bader that appellant was fit to drive when he saw appellant at about 1:15 A.M., renders it questionable whether there was a preponderance of evidence to support the conclusion *379 that the consumption of alcoholic beverages affected appellant's ability to operate the car safely.
Since the evidence given by Trooper Porter has not been considered in this analysis of the evidence, it is unnecessary to determine what weight, if any, should be given to his testimony.
Detective Heilfurth's testimony and David's statement to him as to the circumstances of the accident stand on a different footing. The majority opinion expresses the view that Heilfurth's statement, if admissible, was "far outweighed" in probative value by the other evidence in the case. In assessing the probative value to be attributed to this witness' testimony, as well as that of the other evidence of the case, and in making independent findings of fact, the majority, in my view, departed from the well-defined role to be performed by appellate tribunals in the review of the action of administrative agencies. The appellate court's function under such circumstances is to examine the evidence in order to determine whether there existed substantial evidence on the whole record to support the determination of the administrative agency. Where such evidence appears, that determination should not be disturbed and the appellate tribunal should generally refrain from exercising its power to make independent findings of fact. Atkinson v. Parsekian, supra.
Moreover, the record amply justifies the Director in giving credence to Detective Heilfurth's testimony and to the written statement obtained from David. True, the appellant had stated to Heilfurth that he had been given a needle and a pill at the hospital. On the other hand, it must be borne in mind that the statement was made after he had already been discharged from the hospital and there is nothing in the record to support a finding that he was unable fully to understand the nature of the statement which he had given. Detective Heilfurth affirmatively testified that at the time he took appellant's statement "his responses to me were clear and coherent. * * * [H]e was perfectly well aware of what he was doing, that he was aware of the situation of where *380 he was, the facts relating to the accident." In Heilfurth's opinion David "was entirely competent to give a lucid statement in regards to what happened."
A cursory examination of the statement made by David reveals that he clearly, coherently and quite comprehensively described the events leading up to the time of the accident. Much of it is in narrative form and has the unmistakable ring of truth. The contrast between David's richly detailed written statement and his vague testimony before the Director fully justified her critical comment:
"* * * In his testimony at the hearing respondent says he could remember nothing about the accident except that he was driving at the lawful speed limit of 50 miles per hour. The credibility of respondent's testimony is impaired considering that the day after the accident he related specific details of his activities on the night of the accident and was able to recall with remarkable clarity details of the accident in an interview with an investigator which he, himself, had employed. Yet at the hearing he remembers nothing except that he was driving lawfully."
The self-serving declaration attributed to appellant by the expert witness Clark that he thought the left tire blew out and the car suddenly went out of control finds scant support in the evidence. The Director was entitled to attribute little weight to this explanation of the occurrence in the light of the other evidence from this witness. Also, it should be noted that neither in his statement nor in his testimony did David even claim that the accident might have resulted from a tire blowout.
The remaining issue (which the majority found unnecessary to decide) is whether the statement given by appellant to Heilfurth was properly admissible in the administrative hearing before the Director. This statement was suppressed in conjunction with the criminal action against appellant as a consequence of which it appears the indictment against David was dismissed. Judge Francis, in granting the motion to suppress the statement, commented that it did not recite certain constitutional requirements "insofar as advising the *381 right to counsel and the right to free counsel and some of the guarantees cited in Miranda."
The statement admitted into evidence discloses that Heilfurth asked David to give a voluntary statement concerning the fatal motor accident and that before David made the statement, Heilfurth gave him the following warning:
"I must advise you that this statement must be given of your own free will and accord, without force, fear, threats or promise of reward. I must also advise you that you have the right to consult an attorney before giving this statement."
I would hold that the warnings prescribed to be given a defendant in a criminal case under the rule laid down by Miranda v. State of Arizona, 348 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) should not be applicable to quasi-judicial administrative proceedings such as that here involved. The proceedings before the Director involved no custodial sanctions whatsoever  merely the suspension of driving privileges for a period of time. Cf. State v. Zucconi, 93 N.J. Super. 380 (App. Div. 1967), presently on appeal to the New Jersey Supreme Court.
The warnings required by Miranda are clear pronouncements of a person's rights, as well as the State's obligations in connection with an action of a criminal nature. There is no basis in precedent or reason why the precise warnings required in Miranda should be imported into and made a mandatory recital in administrative proceedings involving infractions of the traffic statute, the consequence of which is the suspension of driving privileges. Legally and practically, a failure to comply with the Miranda litany should not automatically cause the exclusion of statements so taken in a driver's license revocation proceeding. The proper standard in such cases is whether the admission of the statement will be so fundamentally unfair as to deprive the appellant of a fair hearing and thus violate the due process requirement of the Fourteenth Amendment.
*382 Appellant was advised that any statement he gave must be given of his own free will and that he had the right to consult an attorney before making such statement. There is nothing in the record which would justify the conclusion that the admission of the statement was fundamentally unfair. On the contrary, there was internal evidence in the statement, as well as the testimony of Heilfurth, which gave support to its trustworthiness and justified the Director in admitting the statement and considering it in arriving at her conclusion.