100 N.J. Super. 71 (1968)
241 A.2d 239
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHARLES W. GILLESPIE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1967.
Decided January 12, 1968.
*74 Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. George K. Meier, Jr. argued the cause for appellant.
Mr. Archibald Kreiger, Assistant Prosecutor, argued the cause for respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Defendant appeals from a conviction of driving a motor vehicle under the influence of intoxicating liquor (N.J.S.A. 39:4-50) in the Passaic County Court following an appeal to that court on the transcript made before the Municipal Court where there had been an initial conviction. The defendant was fined $200 plus $25 costs and his driver's license was revoked for two years. Under the statute, a first-time offender is subject to a fine of between $200 and $500 or imprisonment for a term of between 30 days and three months, or both, in the discretion of the judge, and to a mandatory revocation of his driver's license for two years. Subsequent offenses are punishable by a mandatory three months jail sentence and ten years' revocation.
A number of questions, constitutional and otherwise, were raised in the county court and here. It should be noted at the outset that the formal charge against defendant fixes the place of alleged violation at "Parking Lot, 140 Hepburn Rd. [Clifton]."

I.
At the time in question, May 8, 1966, the defendant resided in an apartment house at 140 Hepburn Rd., Clifton. Supplemental testimony taken before the county court on a remand at our direction establishes that the owner and operator *75 of the apartment house also maintained a parking garage with two indoor levels and a roof parking area. As of May 8, 1966 the indoor levels were open only to tenants, but the rooftop, where this offense allegedly occurred, was open not only to tenants, but visitors, tradesmen and anyone else having occasion to be at the property. Even persons having no business there were not impeded from parking on the rooftop prior to July 1, 1966 when a gate was installed excluding those with no business at the premises.
On the basis of the foregoing proofs the county court found the rooftop garage area to be as of May 8, 1966 a "quasi-public" place and within the purpose and object of the statute as to places where driving under the influence is intended to be proscribed.
In State v. Sisti, 62 N.J. Super. 84 (App. Div. 1960) we held the act was not designed to limit the field of its prohibition to public highways and included the general parking area made available for customers of a private business concern  a shopping center. Defendant argues that the factual situations there and here are not analogous. We do not agree. Except in terms of the number of vehicles potentially involved, we do not regard this case as distinguishable in principle from Sisti. The operation of a motor vehicle while under the influence of intoxicating liquor in a quasi-public place involves extraordinary danger of injury to the driver or other members of the public or damage to their property, just as does driving in that condition on a public highway.

II
Defendant's major contention is that he was convicted illegally because of the introduction before both trial courts against him of admissions in police custody to, and as a result of interrogation by, a police officer and an examining police physician without the prerequisite warnings and waiver of rights required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
*76 Defendant did not testify in his own defense. The pertinent proofs are as follows.
At approximately 7:30 P.M. on the evening of May 8, 1966 Mr. Koubek, a tenant at the apartment house, noticed from his patio a car having difficulty getting into a parking place on the parking roof. A grey Buick sedan was attempting to park immediately adjacent to his own car. As he continued his observation, from a distance of 150 feet, he saw and heard his car bumped by the Buick, whereupon he started downstairs, calling the superintendent to come out with him. When he got to the parking area Koubek saw defendant looking at the damage to Koubek's car. At this point defendant was either entirely out of the Buick or was just getting out. In the course of their conversation defendant acknowledged to Koubek that the Buick belonged to him and said: "Look at the damage to my car and I don't know how I got any of them."
Clifton Police Officer Sembertovich testified he was detailed to the scene of "an accident" at 7:40 P.M. that day and went to the premises. He saw defendant leaning against the Buick. Koubek told him defendant had struck his car and defendant denied it. The officer concluded that defendant's car had struck Koubek's by examining the location of damage and paint scrapes on the vehicles. Somewhere in the course of his investigation the officer conducted an interrogation of defendant and arrested him for drunken driving, but the transcript unfortunately makes it impossible to determine just how much of the interrogation preceded the arrest. The significant testimony of the officer is as follows:
"Q. What then occurred [after inspecting the damage]? A. I then asked Mr. Gillespie what had occurred. He said he didn't know. I asked him for his driver's license and registration. He was fumbling with his wallet and could not produce them. Then I asked Mr. Koubek what happened. His statement is on the report, your Honor. I asked Mr. Gillespie to walk a line that was in the road. He could not do so. He staggered and stumbled from side to side. He had to lean against the cars, and he needed support. I then told Mr. *77 Gillespie I am placing him under arrest while driving under the influence of alcohol, due to Mr. Koubek's statement.
Q. Officer, did you ask Mr. Gillespie if he had been driving? A. Yes, I did. He said he had been driving. He said he drove from New York. He thought he was still in New York.
Q. Would you describe the defendant's appearance at the scene of this accident? A. Well, his eyes were bloodshot and he had a very strong odor of alcohol on his breath. As I stated, he was staggering and could not support himself without aid from the police truck or the other vehicles in the immediate area.
Q. Will you describe his speech at the scene of the accident? A. It was slurred. It was difficult to understand."
On cross-examination, the officer also testified responsively that defendant said "he had tried to park his car in the parking lot, but he couldn't make it."
The officer testified that after the arrest defendant was placed in the police van for the trip to headquarters and at that time he informed defendant "he had a right to refuse to answer all questions that were put to him and that he was entitled to a lawyer." At headquarters, he took defendant to the examination room. Defendant then asked, "When can I get a lawyer?" He was told, "any time he wants to." Defendant asked that a lawyer be called, but upon the officer's asking for the telephone number, defendant said he did not know the name of the lawyer  only that he was in New York. At that point Dr. Gerow, the police examining physician, began his examination of defendant in the officer's presence.
Dr. Gerow testified that when the defendant was brought into the examining room, he "was swaying, staggering, falling against the wall and furniture * * * he kept falling." He told the defendant who he was and said if the defendant had his own lawyer and doctor he could refuse any tests or questions. Defendant did not respond to that. He gave his age (49), weight (190) and occupation (consulting engineer). The doctor had defendant sign his name for comparison with his driver's license and found it "very poor." On interrogation, defendant said he was driving his car when arrested; had had four drinks of scotch, but couldn't say *78 when. He had not been to a doctor recently, was not under medication, had no physical disability in driving a car, or otherwise, or history of illness. However, he said he had a right leg three-quarters of an inch shorter than the left and that he walked with a limp. He said he knew he was being examined for sobriety. When asked whether he would submit to a blood test, the defendant stated he wanted first to consult with a lawyer, and at that point the doctor ceased his examinations and observations.
The doctor's observations of the defendant were stated as follows:
"A. He had a very strong alcoholic odor. His face was flushed, clothes were orderly. His attitude, he was very talkative. His eyes were watery, marked bloodshot. Pupils were dilated. Balance, wobbly, staggering. Walking was swaying, staggering. He needed constant help to keep from falling. Turning around was swaying and staggering and stumbling. Speech was confused, and talking was a little difficult at times to understand."
On objection at that point the court [magistrate] ruled it would not admit in evidence any interrogation after the request for a lawyer last mentioned, but would admit any observations of the defendant's condition before or after. The doctor gave it as his opinion that the defendant was at the time under the influence of intoxicating liquor  "under the extreme effects of alcohol * * * ability to drive [was] impossible * * *. [T]he limp had nothing to do with defendant's swaying, staggering and falling."
After denial of a motion to dismiss on grounds of insufficiency of proof and that the place was a private area, defendant's brother John Gillespie testified for the defense that defendant drove to his home (Cedar Grove) at 5:00 P.M. on the date indicated. He was soon after served a drink of liquor of 1 1/2-2 ounces with water and another an hour later. He knew of no other drink taken by defendant.
A Dr. Brill testified that he examined defendant several weeks after the occurrence and took a history from the defendant *79 of having had four drinks of scotch on May 8, the first at 1:00 P.M. and the last three at 4:45 P.M., 5:45 P.M., and 6:45 P.M. respectively. He drove from his brother's home to his own, arriving at 7:30 P.M., and having had no difficulty except in parking at the apartment. Dr. Brill took defendant's blood pressure, and found it to be 138/98, the systolic (lower) figure being "dangerous." The redness of defendant's face could be "discoid lupus," not related to inebriation. On the basis of a hypothetical question mentioning only 2 drinks of liquor plus the staggering, erratic speech, and other observations of the State's witnesses, his opinion was that on the date and time in question the defendant was not under the influence of liquor but was having a fleeting cerebral incident described as a "cerebral ischemic attack." Prime reliance was placed on the blood pressure reading. The liquor consumed (assuming 2 ounces per drink), as against the time lapse, defendant's weight and the strength (proof) of the liquor would produce as of 7:30 P.M. a blood alcohol content of between 0.044% and 0.028%. If the defendant had had four drinks, as he admitted to Dr. Brill, his estimate would be between 0.078% and 0.062%, "well below the level for intoxication."[1]
The county court held, on the basis of dictum in State v. Zucconi, 93 N.J. Super. 380 (App. Div. 1967), affirmed on other grounds after the decision below in this case, 50 N.J. 361 (1967), that the rule of Miranda, supra, is not applicable in motor vehicle violation cases. In Zucconi we stressed the fact that the offense there involved  careless driving  carried potential imprisonment of only 10 days and that the punishment imposed was only a fine. (Id., at 388, 392). While we expressed the opinion that Miranda should not *80 apply in motor vehicle cases as a class, definitive resolution of the issue was averted both by us and the Supreme Court in view of the facts that the case was tried before the decision in Miranda and that the interrogation was not conducted in circumstances of police custody of the defendant.
Before considering whether Miranda is applicable at all to drunken driving, with its potential of three months' imprisonment upon conviction, we have the preliminary difficulty here as to whether the interrogation by the police officer developing the admission of driving took place before or after the arrest. The Miranda rule begins to operate when an individual is taken "into custody or otherwise deprived of his freedom of action in any significant way" (384 U.S. 436, 444, 86 S.Ct. 1602). We think arrest, even on the street, meets that criterion. But we shall not pursue the issue of custody since the only admission then made and constitutionally privileged under Miranda would be as to the fact of driving, and we will show and hold hereinafter that this, if error, was harmless beyond a reasonable doubt.
There is no question but that, given the applicability of Miranda, the admissions of driving and of consumption of four drinks to the police doctor at the police station in the presence of the arresting officer were made while under custodial interrogation. The warnings given were obviously insufficient and there was no satisfactory proof of waiver of rights by the defendant, particularly in the light of the fact that he first told the police officer he wanted a lawyer. (384 U.S., at 475, 479, 86 S.Ct., at 1602).
However, the potential application of Miranda is irrelevant to any non-testimonial conduct or utterances of the defendant here adduced in evidence through the police officer and the police doctor such as his general appearance, odor of alcohol, manner of speaking and of walking and as to his handwriting being tested. Neither the privilege against self-incrimination nor the right to counsel was invaded by the use at trial of the evidence thus elicited. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d *81 908 (1966) (sustaining the constitutionality of the involuntary taking of blood for incriminatory testing from the body of a suspect in a drunken driving case).
We thus arrive at the substantive question whether custodial interrogation of an arrestee on charges of drunken driving punishable on conviction by sanctions including a three months jail term is within the requirements for warning and waiver of Miranda. We refer to our extended discussion of the broad principles relevant thereto in minor criminal offenses and quasi-penal infractions such as the generality of motor vehicle violations as set forth in State v. Zucconi, supra (93 N.J. Super., at 384-391). We basically adhere to those views. See also State v. Smith, 181 Neb. 846, 152 N.W.2d 16, 21 (Sup. Ct. 1967); People v. Bliss, 53 Misc.2d 472, 278 N.Y.S.2d 732 (Co. Ct. 1967). But see State v. Meunier, 126 Vt. 176, 224 A.2d 922 (Sup. Ct. Vt. 1966).
In David v. Strelecki, 97 N.J. Super. 360 (App. Div. 1967), we found it unnecessary to decide the issue there raised  whether Miranda applied in relation to an administrative proceeding concerning a motor vehicle offense potentially involving suspension of driving privileges (97 N.J. Super., at 371-2)  but one member of the Part which decided that case, in dissenting, took the negative position on the issue, pointing out that the proceedings "involved no custodial sanctions whatsoever  * * *." (Id., at 381).
The implications from most of such meager authority as now exists on the general subject seem to point to the substantiality of the potential penal incarceration for the offense as the most weighty criterion of applicability of Miranda. State v. Zucconi, supra; David v. Strelecki, supra; Lung v. State, 420 P.2d 158 (Okla. Ct. Cr. App. 1966) (unauthorized use of motor vehicle; 3 years imprisonment); People v. Letterio, 16 N.Y.2d 307, 266 N.Y.S.2d 368, 213 N.E.2d 670 (Ct. App. 1965) (Bergan, J., concurring, 213 N.E.2d, at 672; and Desmond, C.J., dissenting, at 674: "We express no new idea when we urge that, where imprisonment *82 threatens, constitutional guarantees as to counsel must apply to `non-serious' as well as `serious' offenses."). Cf. State v. Davis, 108 N.H. 45, 226 A.2d 873 (Sup. Ct. 1967); State v. Corrigan, 4 Conn. Cir. 190, 228 A.2d 568 (Cir. Ct. App. Div. 1966); Dixson v. State, 54 Misc.2d 100, 281 N.Y.S.2d 912 (Ct. Cl. 1967).
Of peripheral relevance is State v. Laird, 25 N.J. 298 (1957). Defendant had been fined for drunken driving; the court later learned of a prior offense and sought to re-sentence defendant as a second offender. This was held impermissible because "the proceeding concerns a punitive offense, quasi-criminal in nature; and there is the same regard here as in strictly criminal cases for the essential civil rights and liberties designed to secure the individual against arbitrary action." (at 302.) Accord: State v. Francis, 67 N.J. Super. 377, 381 (App. Div. 1961): "Proceedings under the reckless driving section of the Motor Vehicle Act * * * are quasi-criminal in nature. The basic rights of a defendant as charged are entitled to the same protection as are normally accorded one accused of a criminal offense. * * * [T]he plea of double jeopardy is, in a proper factual setting available to a defendant charged with multiple offenses under the Motor Vehicle Act." The right to a speedy trial is another of those "basic rights" of one charged with a motor vehicle violation. State v. Hulsizer, 42 N.J. Super. 224, 228 (App. Div. 1956) (drunken driving prosecution).
Also meriting a place on the credit side of the balance sheet in favor of applying the Miranda rule in drunken driving cases in this State is the impairment of judgment bearing upon protection of one's rights often apt to be present in persons taken into custody on this charge. Cf. David v. Strelecki, supra (97 N.J. Super., at 370).
The many considerations, mostly of a practical nature, pointing the other way, and particularly those related to the frequency of such prosecutions and the difficulties of mobilizing counsel quickly for those arrestees unable to afford them, are common to the general category of motor vehicle offenses, *83 and the pertinent discussion in State v. Zucconi, State v. Smith, and People v. Letterio, all supra, need not be here repeated. See also City of Columbus v. Hayes, 9 Ohio App.2d 38, 222 N.E.2d 829, 830 (Ct. Ap. 1967) which, without discussion, strangely held the penalty for drunken driving (which it did not mention) "not now such as to bring this case within constitutional limitations on custodial interrogation."[2]
The issue is close and weighty. If we can avoid deciding it here, the Supreme Court not having spoken, we should. We have decided to take no definitive position on the point since we are perfectly clear that any adverse proofs by way of admissions by the defendant to either the arresting police officer or the police doctor were harmless error beyond a reasonable doubt. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
The two predicates for liability are: (1) that defendant drove the car at the parking garage; (2) that at the time he was under the influence of intoxicating liquor.
(1) Putting to one side the defendant's admissions to the police officials that he was driving, it is virtually impossible to repel the inference from the testimony of the witness Koubek and the objective attendant circumstances, including the paint and damage marks on the two cars, that defendant was operating his Buick in trying to back into the parking space. His car had been moving and there is not the remotest contention that the driver could have been anyone other than defendant. Further, the defense witnesses Gillespie and Dr. Brill gave testimony that defendant drove to his apartment house at about 7:30 P.M.
(2) As to the issue concerning defendant's intoxicated condition, defendant's statement to Dr. Gerow that he had had four drinks during the afternoon can be discarded without *84 affecting the damning effect of all the other evidence bearing upon his condition in view of his having given the same information as to the four drinks to Dr. Brill, which the latter put into evidence as part of his testimony as to the history given him by the defendant as to his activities the afternoon and early evening of the date of the alleged offense. Thus, even without the statement to Dr. Gerow, there was no respectable hypothesis for a finding of innocence on the issue of intoxication in the light of the other proofs concerning the observations made by the officer and Dr. Gerow, all of which were, as seen above, free from the taint of Miranda even were it applicable in this case. Dr. Brill's defensive testimony was in our view speculative to the extreme and almost totally lacking in probative force, and we are confident that this was the reason the county court did not even advert to it in its oral conclusions of guilt.
In sum, we are satisfied beyond a reasonable doubt that defendant's inculpatory admissions to Officer Sembertovich and Dr. Gerow were harmless if not properly admissible under Miranda because they played no material part in his conviction of the offense charged.

III.
Defendant argues that all the incriminatory evidence, testimonial admissions and otherwise, elicited from him after his arrest and trip to the police station, was illegal as the fruit of an illegal arrest. This is founded upon the premise that the offense (driving under the influence) does not amount to a crime punishable by more than one year in state prison; hence the arrest could be lawfully effected without a warrant (there was none here) only if committed in the officer's presence. State v. Doyle, 42 N.J. 334, 349 (1964). It cannot be denied that defendant did not drive in the presence of the arresting officer. The argument gains strength from the fact that the section of the motor vehicle act providing for arrest without warrant by law enforcement *85 officers for violations of chapter 4 of title 39 of the annotated statutes (which includes drunken driving) is expressly limited to violations in the presence of the officer. N.J.S.A. 39:5-25.
We agree with the defendant's position to the extent of the assertion that the incriminating observations of defendant's condition and behavior after his arrest at the police station were events so immediate upon and consequential to his arrest as to warrant characterization thereof as the fruit of the arrest, within the meaning of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Cf. State v. Hodgson, 44 N.J. 151 (1965).
Moreover, we reject as without merit the State's position that defendant waived any quality of illegality of the evidence under the foregoing circumstances by virtue of his having appealed to the county court. R.R. 3:10-10(b) has no such effect in relation to errors of federal constitutional magnitude. A contention based upon the Fourth Amendment is here implicated.
However, we conclude that notwithstanding the technical invalidity of the arrest, the subsequent enforced subjection of the defendant to examination for intoxication was justified as an emergency measure to assure the State against loss of evidence of defendant's guilt of an offense which, although not graded a crime, is of a kind which poses an extremely grave menace to the public safety and welfare.
Had the police officer refrained from immediate apprehension and subjection of defendant to physical examination, in order to accommodate the requirement that he first procure an arrest warrant, defendant might have absented himself until a time when his symptoms of inebriation were gone or had become minimal. Just as in Schmerber v. State of California, supra, where the involuntary taking for testing of the blood of an arrested suspect of drunken driving was sustained as an emergency measure notwithstanding the court was not satisfied that the act could be justified as a search *86 incidental to an arrest,[3] "[t]he officer in the present case * * * might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened `the destruction of evidence.'" (Id., 384 U.S., at 770, 86 S.Ct., at 1835). What in Schmerber was thus held, for emergency reasons, a justified transgression beyond the normal scope of a search incident to an arrest, is by unexceptionable analogy here authoritative to justify a forced examination of a person reasonably believed to be under the influence of intoxicating liquor notwithstanding the absence of a technical foundation for an arrest, as such. It does not appear that defendant was confined any longer than was necessary to conduct the examination. The totality of circumstances made the seizure "reasonable." Cf. State v. Boykins, 50 N.J. 73, 78 (1967).
There is of course nothing new about the "emergency" or "necessitous circumstances" exception to the ordinary prerequisites for a valid search or seizure under the Fourth Amendment. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); State v. Gosser, 50 N.J. 438, at 447-448 (1967); State v. Macri, 39 N.J. 250, 254 (1963); State v. Naturile, 83 N.J. Super. 563, 568 (App. Div. 1964).

IV.
Defendant's final contention, that the testimony of John Gillespie and Dr. Brill required an acquittal, is frivolous.
Judgment affirmed.
NOTES
[1] N.J.S.A. 39:4-50.1 provides that in a prosecution for drunken driving, a reading of 0.05% or less creates a presumption of not being under the influence; between 0.05% and 0.15% creates no presumption either way but may be considered along with the other evidence; and 0.15% or more creates a presumption of being under the influence.
[2] The penalty happens to be a fine up to $500 and imprisonment of not less than three days nor more than six months. Page's Ohio Rev. Code Annot. (1965) Secs. 4511.19, 4511.99(b).
[3] The arrest was valid under California state law (384 U.S., at 768, n. 12, 86 S.Ct., at 1826).