Argued February 7, affirmed May 1, 1979

STATE OF OREGON, *Respondent,*
*v.*
ROBERT BRUCE HEINTZ, *Petitioner.*
(TC 17-023, CA 8026, SC 25913)
594 P2d 385

James E. Mountain, Jr., Deputy Public Defender, Salem, argued the cause for petitioner. On the brief were Gary D. Babcock, Public Defender, Robert C. Cannon, Deputy Public Defender, and Mark E. Birge, Law Clerk, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James E. Redden, Attorney General, Al J. Laue, Solicitor General, and Kent B. Thurber, Assistant Attorney General, Salem.

TONGUE, J.

Linde, J., specially concurring opinion.

**TONGUE, J.**

Defendant was convicted of manslaughter in the second degree, ORS 163.125, after an automobile accident in Washington County in which the passenger of the car being driven by him was killed. The Court of Appeals affirmed the conviction. 34 Or App 175, 578 P2d 447 (1978). In doing so it rejected defendant's contentions: (1) that the taking of a blood sample at a hospital without defendant's consent and not as an incident to his arrest was an unreasonable search and seizure, and (2) that the results of the blood tests were inadmissible in the absence of evidence that the technician performing such tests had a permit as required by ORS 487.815. We accepted review because of the importance of the questions raised by these contentions.

### 1. *The taking of the blood sample.*

In considering defendant's first contention the facts are important, as they appear from the record of the hearing on defendant's motion to suppress the blood alcohol test results.

Officer Bailey was the first police officer at the scene of the accident, arriving at 4:23 a.m. He found that defendant's car had left Cornell Road at a point where he found no skidmarks and had "ploughed the dirt" off the road for 57 feet before striking a power pole and then continuing on for another 163 feet before striking and breaking another power pole, where the car had come to rest on its side, "wrapped around" the power pole, with its top smashed in and with defendant and his passenger trapped inside.

Officer Bailey called for a rescue unit of firemen. It then took them one hour and forty minutes to remove defendant from the wreckage. While defendant was lying on a stretcher and prior to his being put into an ambulance, Officer Bailey asked him "if he had been drinking" and was told "yes * * * he had been drinking beer earlier." The officer also testified that defendant

[241]

had "a moderate odor of alcohol about his breath and bloodshot eyes."[1]

A second officer, Officer Owsley, arrived at the accident scene at 5:29 a.m., before the rescue unit had "extricated" defendant from the wreckage. He "surveyed the scene" and took pictures, but did not talk to the defendant at that time. Defendant was then taken by ambulance to St. Vincent's Hospital, the hospital closest to the point of the accident. Officer Owsley testified that he went to the hospital to investigate the case as a negligent homicide because a person had been killed and he had been told by Officer Bailey that the defendant had admitted that he had been drinking.

At the hospital Officer Owsley talked to the defendant. He testified that he bent down close to defendant and "could smell a strong odor of—sour odor of alcohol beverage on his breath" and also noticed that "he had very bloodshot eyes." Officer Owsley also testified that at the hospital he "formed the opinion" that defendant was under the influence of intoxicating liquor, based upon the strong, sour odor of alcoholic beverages on his breath, the manner of his driving (i.e., the indications at the scene that defendant's car was going at a tremendous rate of speed) and defendant's admission that he had been drinking.

At 6:32 a.m. Officer Owsley taped a conversation with defendant which was paraphrased as follows:

"We would like to draw blood for the purpose of a blood alcohol test. Will you consent to that? Okay, and you have nodded your head. Okay, thank you very much."

Officer Owsley testified that defendant "appear(ed) to be able to understand (the) question" and that he was lucid and aware and nodded his head, but that he probably did not understand the implication that the

---

[1] It later developed that defendant may have had glass fragments in his eyes, but there is no evidence that this was known to the officers at the time of their observations of him.

blood test could be used against him in a criminal case. The officer then prepared "consent forms," as required for the hospital to draw the blood, and which were witnessed by two nurses, who testified that they would not have done so if they had felt that defendant had not consented, but that defendant was in "pretty bad shape" at that time. The consent form was not read to defendant or signed by him. A blood sample was then taken by a hospital technician. A second blood sample was taken at 7:32 a.m. At no time prior to the taking of these blood samples was defendant formally placed under arrest.

According to the doctor in the emergency room at the time the blood samples were taken from defendant, he was then in "serious condition." He had a fractured arm, a compound fracture of the leg, a concussion, and numerous head and scalp lacerations. There were three or four people working on him. He had oxygen tubes in his nose, catheters in his bladder and veins and was being fed intravenously.

Officer Owsley testified that to secure a search warrant for the drawing of the blood at that time, he "would have had to get back to the office and would have had to dig out a typist," apparently to type the affidavit necessary to secure the warrant; that if he had believed that he needed a search warrant he would have secured one, but that he was "not sure that (he) would have had time" to do so. A warrant was later secured, however, to obtain the two blood samples from the hospital.

On this record the trial court denied defendant's motion to suppress, holding that in this case consent was irrelevant because there was probable cause and exigent circumstances sufficient to justify drawing of the blood; that there was no need to make an arrest before doing so, and that an arrest "might even have caused some kind of psychological or medical damage to the patient at that particular time * * * which might

have jeopardized * * * defendant's life or his ability to get well * * *."

The Court of Appeals affirmed, holding that:

"* * * A warrantless search is permissible if there was probable cause for a search and exigent circumstances. Defendant's admission that he had been drinking is substantial evidence of probable cause. There were exigent circumstances as a matter of law because of the medical fact that alcohol in the blood dissipates with the passage of time." 34 Or App at 178.

Defendant contends in his petition for review that:

"The Court of Appeals' decision condoning the warrantless seizure of defendant's blood, without his consent, and while he was not under arrest, is inconsistent with and contradictory to the overwhelming majority of cases interpreting the United States Supreme Court decision in *Schmerber v. California,* 384 US 757 (1966) and the Fourth and Fourteenth Amendments to the United States Constitution."

In *Schmerber,* as in this case, the defendant was involved in an auto accident. The patrolman arriving at the scene shortly after the accident smelled liquor on defendant's breath and noticed his eyes appeared bloodshot. The defendant was taken to a hospital for treatment. While in the hospital, he was arrested for driving under the influence. After the arrest, a sample of the defendant's blood was withdrawn by a physician at the police officer's request. The officer possessed no search warrant, nor did the defendant consent. Schmerber objected to the admission in evidence of the blood alcohol test results at trial, asserting they were the product of an unconstitutional search and seizure. The United States Supreme Court rejected the contention and held the blood test results to be admissible, stating that:

"Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." 384 US at 771.

Defendant construes *Schmerber* as holding that before blood can be taken from a defendant under such facts, there must first be an arrest of the defendant in the absence of consent by him. Some state courts have so held, as contended by defendant.[2] In this case, however, at the time of the taking of the sample of blood from this defendant, he was in a hospital in such a serious condition as to be unable to give knowing consent to the taking of such a sample. Indeed, defendant concedes in his petition for review that:

> "Several courts acknowledge a prior arrest requirement in *Schmerber,* but deem that requirement satisfied where the accused's state of consciousness is such that he could not be made aware he was under arrest. * * *"

As stated in *Mercer v. State,* 256 Ark 814, 510 SW2d 539, 541 (1974), under similar facts:

> "* * * [I]t would be absurd and ridiculous to hold that an officer would have to be so inhumane as to invariably arrest a person teetering on the brink between life and death before his blood alcohol content would be admissible in evidence. * * *"

To the same effect, it was held in *People v. Fidler,* 175 Colo 90, 485 P2d 725, 727 (1971), that:

> "In *Schmerber,* the defendant, on advice of counsel, refused to consent. Here, the defendant was in a semiconscious condition and was unable to consent or to refuse to give his consent. These differences do not affect the *Schmerber* principle.
>
> "Also, in *Schmerber,* it appears that the defendant was arrested prior to the time the police officer directed the doctor to withdraw the blood. The record here does not disclose when Fidler was arrested. This is not a controlling fact under the circumstances of

---

[2] *People v. Superior Court,* 6 Cal 3d 757, 100 Cal Rptr 281, 493 P2d 1145 (1972); *Layland v. State,* 535 P2d 1043 (Alaska 1975); *Mitchell v. State,* 227 So 2d 728 (Fla App 1969) (rev. 245 So 2d 618); *State v. Richerson,* 87 NM 437, 535 P2d 644 (1975); *State v. Wetherell,* 82 Wash 2d 865, 514 P2d 1069 (1973); *People v. Todd,* 7 Ill App 3d 617, 288 NE 2d 512 (1972) *(but see* People v. Todd, 59 Ill 2d 534, 322 NE 2d 447, 453 (1975)); *State v. Capelle,* 285 Minn 205, 172 NW 2d 556 (1969); *State v. Davis,* 108 NH 45, 226 A.2d 873 (1967).

this case. The patrol officer, given the facts as to the collision, the smell of alcohol on defendant's breath and the finding of two half-emptied wine bottles in defendant's vehicle, had probable cause to direct the withdrawal of the blood. * * *"

Similarly, it was held in *Carrington v. Superior Court,* 31 Cal App 3d 635, 641, 107 Cal Rptr 546 (1973), although a case in which the defendant was completely unconscious, that:

"* * * [D]ue to the fact that the defendant was unconscious, the officer was incapable of communicating to him the fact of arrest. (Pen. Code § 841.) Talking to an unconscious person has never been looked upon as productive of a meaningful exchange of ideas. Even were he to engage in this "ritualistic incantation of words," they would not be communicated to the defendant due to his unconscious state. * * *"

*See also,* to the same effect, *State v. Deshner,* 158 Mont 188, 489 P2d 1290 (1971); *State v. Findlay,* 259 Iowa 733, 145 NW 2d 650 (1966). *See generally* Annot., 72 ALR 3d 325, 327 (1976).

We need not decide whether these cases were rightly decided, because we believe that this case is controlled by the decision of the United States Supreme Court in *Cupp v. Murphy,* 412 U.S. 291 (1973), which case arose in Oregon and was decided subsequent to *Schmerber.*

In *Cupp,* the wife of the defendant (the respondent in that case) had been strangled in her bed. Defendant voluntarily came to the police station for questioning. The police noticed a dark spot on one of his fingers and asked if they could take a sample of scrapings from his fingernails. Defendant refused consent and the sample was taken over his protest, but without a formal arrest of defendant and without a search warrant. It contained traces of skin and fabric from the victim's nightgown.

The court noted (at 294) that although "the police did not obtain an arrest warrant or formally 'arrest' the respondent, as that term is understood under Oregon law" (which at that time defined "arrest" in ORS 133.210 as "the taking of a person into custody so that he may be held to answer for a crime"), the detention of the defendant nevertheless constituted a "seizure" for purposes of the Fourth Amendment. The court then stated that there was probable cause to believe that the defendant had committed the murder, and held (at 295) as follows:

> "We believe this search was constitutionally permissible under the principles of Chimel v. California, 395 U.S. 752, 23 L Ed 2d 685, 89 S Ct 2034. Chimel stands in a long line of cases recognizing an exception to the warrant requirement when a search is incident to a valid arrest. * * *"

The court (at 296) limited its holding as follows:

> "* * * We do not hold that a full Chimel search would have been justified in this case without a formal arrest and without a warrant. But the respondent was not subjected to such a search."
>
> "* * * * *
>
> "The rationale of Chimel, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails, cf. Schmerber v. California, 384 US 757, 16 L Ed 2d 908, 86 S Ct 1826."

The court concluded (at 296):

> "On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments. * * *"

■   Similarly, in this case it is clear, in our opinion, that the police had sufficient probable cause both to arrest the defendant (if not for negligent homicide or DUII, at least for reckless driving) and to believe that a test of a sample of his blood would reveal alcohol.

[247]

Further, since the time of *Cupp,* the definition of "arrest" has been changed in Oregon. ORS 133.005(1) now provides that an arrest includes the placing of a person "under actual or constructive restraint."[3] We believe that when the police officer in this case directed that blood be taken from the defendant at the hospital after the fatal accident, defendant was "under actual or constructive restraint" so as to be under arrest for purposes of ORS 133.005(1). *See* State v. Groda, 285 Or 321, 325-26, 591 P2d 1354 (1979), and cases cited therein.

In addition, the "intrusion" that took place under the facts and circumstances of this case to preserve the evidence was a limited one. As stated by the Supreme Court of the United States in *Schmerber v. California, supra,* at 771, in approving the taking of a blood sample "in a hospital environment" as a "minor intrusion * * * under stringently limited conditions," as in this case:

> "* * * Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. * * *"

Finally, it is also clear that alcohol in blood after drinking is "highly evanescent evidence" (412 US at 296) in that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Schmerber v. California, supra,* at 770.

Defendant attempts to distinguish *Cupp* on the grounds that whereas the defendant in that case was not "formally" under arrest, the search in that case was nevertheless "justified as an incident to a lawful arrest"; that the defendant in *Cupp,* upon being

---

[3] ORS 133.005(1) states:

"'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging him with an offense. * * *"

"apprised of his suspected role in the crime," made an "attempt to destroy some evidence," which was not possible in this case because "only the passage of time" could "destroy" the alcohol content of defendant's blood, and that the taking of blood is "sufficiently more intrusive" than the scrapings in *Cupp* to make the search illegal.

We are of the opinion, however, that the facts in *Cupp* and in this case are sufficiently similar to warrant our application of the rule in that case to the facts of this case. In both cases, the important factors were that the police not only had probable cause to make an arrest, but that the defendant was "seized" in such a manner as would now constitute an arrest under ORS 133.005(1); that the evidence in both cases was "highly evanescent" (as held in *Schmerber*), and that the intrusion in both cases was not only a "minor intrusion" (as also held in *Schmerber*), but was no more intrusive than was necessary to preserve the "highly evanescent" evidence. In addition, and as previously noted, there is the important additional factor that at the time of the taking of the blood sample, defendant was in the hospital in serious condition.

■ Since the decision by the Supreme Court of the United States in *Cupp v. Murphy, supra,* it has been held under similar facts that the taking of a blood sample is proper under the rationale of that case without either express consent or an arrest, at least when the defendant is in a "medical environment" in a hospital and in a serious physical condition. Thus, as held in *State v. Oevering,* 268 NW 2d 68, 73 (Minn 1978):

> "Under the theory of *Cupp v. Murphy, supra,* then, a warrantless body search may be conducted in spite of the fact that the person searched is not formally under arrest when (1) the character of the search is highly unintrusive, (2) the evidence sought will be forever lost absent the search, and (3) sufficient probable cause exists to support a formal arrest.

"* * * * *

"* * * [T]he *Cupp v. Murphy* doctrine can serve an important function in criminal negligence prosecutions. Alcohol-related accidents often produce unconscious or uncommunicative victims. We think it would be absurd to demand the performance of an arrest ritual in the presence of such persons as a prerequisite to the admission of probative blood-alcohol evidence against them. Rather, it seems eminently more sensible to allow the admission of such evidence where probable cause would plainly have supported the arrest of such persons had they been fully conscious. We therefore adopt the rule of *Cupp v. Murphy, supra,* for criminal negligence prosecutions in Minnesota.

"On the facts of this case, we are convinced that the *Cupp v. Murphy* requirements have been fulfilled. * * *"

**3.** To the same effect, as held in *Com. v. Funk*, 254 Pa Super 233, 385 A2d 995, 999 (1978):

"* * * We recognize that as a blood test is a search, its administration on a suspect unable to refuse it must pass the test of constitutionality. In *Commonwealth v. Quarles, supra,* [229 Pa Super 363, 324 A2d 452 (1974)], applying this test, we looked to *Cupp v. Murphy*, 412 US 291, 93 S Ct 2000, 36 L.Ed.2d 900 (1973), and held that a blood test may be taken against a suspect's wishes and without an arrest, where the police have probable cause to believe the suspect was driving while intoxicated, in order to get evidence of the blood alcohol level, evidence that is particularly evanescent. Thus the test here was constitutional. * * *"

We need not decide whether these cases were correct in dispensing with the arrest requirement under such circumstances, however, because as previously noted we find that defendant was under arrest for purposes of ORS 133.005(1) at the time the blood sample was taken.

As stated by the Supreme Court of the United States in *Breithaupt v. Abram,* 352 US 432, 439 (1957), although in a somewhat different context:

"* * * Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

"As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. * * *"

Again, *see Schmerber v. California, supra,* at 771, as previously quoted, to the same effect.

For these reasons, and under the particular facts and circumstances of this case, we affirm the holding of the trial court and the Court of Appeals that the taking of the blood samples from the defendant was not an unreasonable search or seizure.[4]

[4] Because of the grounds on which we base our decision, we need not decide whether the Court of Appeals was correct in its reasoning (at 34 Or App at 178) to the effect that a warrantless search was proper under the facts of this case without the necessity of an arrest. *See, generally, State v. Murphy,* 2 Or App 251, 257-59, 465 P2d 900 (1970); *State v. Elk,* 249 Or 614, 624-25, 439 P2d 1011 (1968), O'Connell, J., concurring; *State v. McMaster,* 118 NJ Super 476, 288 A2d 583 (1972); *State v. Gillespie,* 100 NJ Super 71, 241 A2d 239 (1968); *DeVaney v. State,* 259 Ind 483, 288 NE2d 732 (1972).

Defendant also contends that his motion to suppress should have been granted by reason of the search and seizure provisions of Article 1 § 9 of the Constitution of the State of Oregon. As in *State v. Greene,* 285 Or 337, 339, 591 P2d 1362 (1979), we decline in this case to consider the adoption of a different rule for the purpose of Article 1 § 9 than the rule which we consider to be the proper rule for the purpose of the Fourth Amendment of the Constitution of the United States.

## 2. The "permit" requirement of ORS 487.815(1).

■ Defendant's second assignment of error is that "[t]he circuit court erred in admitting evidence of defendant's blood-alcohol results, where no evidence was presented that the lab technician performing the test had a valid permit as required by ORS 487.815." Although it now appears that both defendant's objections to such evidence at the time of trial and his assignment of error on this appeal are defective,[5] we will nevertheless consider the merits of this assignment. One of the reasons we accepted review in this case was to determine whether the Court of Appeals was correct in its decision on this question.

ORS 487.815(1)[6] provides:

"Chemical analyses of the person's breath, blood, urine or saliva, to be valid under ORS 487.545, shall be performed according to methods approved by the Health Division and by an individual possessing a valid permit to perform such analyses issued by the Health Division."

ORS 487.820, however, provides:

"The provisions of the implied consent law, ORS 487.805 to 487.815, 487.825 to 487.835, except 487.545 and subsection (3) of ORS 487.805, shall not be construed by any court to limit the introduction of otherwise competent, relevant evidence in any civil action, suit or proceedings or in any criminal action other than a violation of ORS 487.540 or a similar municipal ordinance in proceeding under ORS 482.540 to 482.560." (Emphasis added)

---

[5] The defect is that defendant did not make such a contention as a ground for objection to that evidence. Defendant later relied upon ORS 487.815 in his motion for a judgment of acquittal and his motion to strike the testimony of the lab technician, but has not assigned as error the denial of those two motions.

[6] Since the date of the accident the provisions of the Implied Consent Law have been reorganized and "renumbered" in the Oregon Revised Statutes. For the sake of simplicity, the present ORS references will be used.

The Court of Appeals held that "[t]he clear import of the latter statute [ORS 487.820] is that the statutory rules concerning the introduction of evidence contained in the implied consent law, including ORS 487.815, apply only in driving while under the influence (DUII) proceedings, ORS 487.540, and have no application to this prosecution for manslaughter." (34 Or App at 178-79)

■ The lab technician in this case was a college graduate with a bachelor of science degree and one year of medical technology training at the University of Oregon Medical School. She was nationally certified as a medical laboratory technician, and had worked for two years in a medical laboratory prior to becoming a criminologist for the Oregon State Police. She had worked in that capacity for over four years and had performed by her testimony over 200 blood alcohol analyses. She used a gaschromatograph procedure approved by the Health Division.[7] There was no evidence, however, that she possessed a valid permit from the Health Division to perform such analyses.

From this evidence, the Court of Appeals concluded that the technician's testimony in this case concerning the blood test "was certainly competent." (34 Or App at 181) We agree.

Defendant seeks to avoid this result by relying upon a footnote in *State v. Stover,* 271 Or 132, 531 P2d 258 (1975). In *Stover,* which was decided under the law as it existed prior to the enactment of the predecessor to ORS 487.820, we concluded that test results obtained without compliance with a provision of the implied consent law which required that a driver expressly consent to a blood test were inadmissible in a prosecution for criminally negligent homicide. In a footnote (n. 10 at 147), we recognized that since the trial of that case the legislature had enacted the

---

[7] *See* Annot., "Qualification as expert to testify as to findings or results of scientific test to determine alcoholic content of blood." 77 ALR 2d 971, 973 (1961)

predecessor to ORS 487.820. We then stated in a further footnote, by way of dictum, that:

> "11. *In State v. Annen,* 12 Or App 203, 207, 504 P2d 1400 (1973), as in the instant case, the violation of the Implied Consent Law involved the consent provisions of the law.
>
> "However, in *State v. Fogle,* 254 Or 268, 459 P2d 873 (1969), this court dealt with the situation where the state failed to introduce any evidence that the equipment used to conduct the breath test had been tested for accuracy by the State Board of Health as required by ORS 483.664(2)(c) [sic, 483.644(2)(c), now 487.815(2)(c)]. Thus our decision in *Fogle* was aimed at the very trustworthiness and competency of the test results. *The ruling in Fogle would not be affected by the passage of ORS 483.648* [Now 487.820]: 'The provisions of the implied consent law shall not be construed by any court to limit the introduction of otherwise competent, relevant evidence. * * *' " (Emphasis added)

■ We now hold, however, that ORS 487.820, as enacted after our decision in *Fogle,* provides, by its express terms, that in a "criminal action other than a violation of ORS 487.540" (DUII), including an action for manslaughter under ORS 163.125, the court may not "limit" the evidence to the introduction of blood tests performed by an individual with a valid permit from the Health Division, but that "otherwise competent, relevant evidence" relating to the alcohol content of the defendant's blood is also admissible in such a proceeding. We also hold that the evidence offered by the state and now objected to by the defendant in this case was "competent, relevant evidence." To the extent that the dictum in footnote 11 of *State v. Stover, supra,* would appear to suggest a different result, that dictum is disapproved.

For these reasons, the decision of the Court of Appeals and the conviction of the defendant are both affirmed.

**LINDE, J.,** concurring.

While I concur in the decision, it seems worthwhile to draw attention to the premises on which it is based and to other premises not presented in this case.

The Court of Appeals thought that a warrantless search of a suspect not under restraint, in this case by drawing some of his blood, could validly avoid the constitutional warrant requirement if there was probable cause for the search and exigent circumstances requiring speedy action. This Court's opinion does not accept that premise. The Court concludes that the blood taken on police request by a qualified hospital employee from the hospitalized defendant and then obtained from the hospital under a warrant was the product of a search incident to an arrest, as defined in ORS 133.005(1),[1] and justified in advance of the eventual search warrant by the exigency of dissipation of alcohol from the blood.

In other words, the decision involves two distinct questions: (1) the propriety of the warrantless search of the person as being incident to an arrest and (2) the propriety of the particular bodily intrusion of taking a suspect's blood under the concrete circumstances of this case. As to the first question, since the defendant was immobilized in a hospital in any event, there might be a potential risk of circular reasoning if the decision depended on the search itself as the "actual or constructive restraint" that placed the defendant under "arrest" within the meaning of ORS 133.005(1); but, as described in the Court's opinion, the police officers no doubt had made that decision before and independently of the blood test. The search therefore followed upon a "restraint," whether "actual or constructive," for which there was probable cause. Accordingly, the court is careful not to approve the opinions

---

[1] ORS 133.005(1):

"Arrest" means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging him with an offense. A "stop" as authorized under ORS 131.605 to 131.625 is not an arrest.

of some state courts that have approved a warrantless body search without prior arrest. As illustrated by the excerpts quoted by the Court, some of these opinions confuse the legal event of "arrest," which depends upon the officer's actions, with the officer's inability or unwillingness to communicate the "arrest" to an unconscious or semi-conscious person.[2]

The significance of an arrest before a search is that for the duration of the detention the officers have legal authority over the detained person. He is in their legal control. If he struggles or tries to leave, he is "resisting arrest" or "attempting to escape." In this situation, a search of his person becomes a "search incident to" an arrest or a legal detention, and the remaining issue is whether its scope is supported by probable cause and exigency and whether a bodily invasion like a blood test is sufficiently more intrusive than a search of, say, clothing to require stricter standards. Of course, once a valid arrest is made, it does not follow that an accompanying search may extend to all kinds of bodily intrusions. In this case, so far as constitutional law is concerned, there was also adequate probable cause to seek a sample of defendant's blood from the hospital, and to ask the hospital to secure such a sample before obtaining the warrant on which the hospital turned over the two samples to the police.[3]

---

[2] This seems also to be meant by the occasional phrases distinguishing arrest from "formal" arrest. While an officer is normally expected to make it clear to a person whether or not he or she is free to leave, it obviously is possible to place an unconscious or uncomprehending person under "actual or constructive restraint." The importance of the legal event of arrest prior to a warrantless and unconsented search is not that the arrested person has been "formally" informed of his arrest, but that the officer has acted to place the person under legal restraint on the information available to the officer before the search.

[3] One cause of confusion in search and seizure issues is the practice of asserting that the police had "probable cause" without finishing the phrase, i.e., "probable cause" for what?

The constitutional phrase is that "no warrant[s] shall issue but upon probable cause . . . and particularly describing the place to be searched, and the person[s] or thing[s] to be seized." Or Const art I, §9, US Const amend 4

The bald notion that police officers could constitutionally make a warrantless "search" of persons not under arrest by taking their blood without their consent has striking implications. If a driver is stopped on suspicion of driving under the influence of intoxicants and requested to submit to having a sample of his blood taken, is he under any obligation to comply without being arrested? If he declines, may officers forcibly hold him while the blood is taken, or is the person privileged to resist or to depart? Does it make sense to speak of an unconsented investigative search without a prior arrest, which in turn must be justified on probable cause? Or is the search for a blood sample in cases like the present limited to the fortuitous circumstances of individuals disabled, hospitalized, or otherwise institutionalized?[4] That seems an unlikely rule of law.

I said above that there was adequate probable cause to seek a sample of defendant's blood in this case so far as constitutional law was involved. Of course, that alone does not *authorize* an officer to take anyone's

---

*(Continued from previous page)*

(the plural forms appear in the fourth amendment). "Exigency," that is to say, circumstances of compelling importance in substance and urgency in time, can excuse proceeding without a warrant. But the "probable cause" to make the particular warrantless search or seizure must be such that a magistrate should, upon having the officer's information before him, properly have issued a warrant describing that particular place to be searched, or person or thing to be seized.

If that involves both an arrest and a search (beyond the search necessary for the officer's security), there must be probable cause for each in turn. "Probable cause" in the abstract justifies no more than the general warrants that the constitutional guarantees were designed to prohibit.

[4] Of course, nothing in the court's present decision suggests that the hospital or its personnel had any obligation to accede to the police request for a blood sample from one of its patients.

In *Cupp v. Murphy,* 412 US 291, 93 S Ct 2000, 36 L Ed 2d 900 (1973), relied on by the Court, the Supreme Court made the point that although Murphy was not "formally 'arrested' . . . the detention of the respondent against his will constituted a seizure of his person, . . ." 412 US at 294. The fact in *Cupp v. Murphy* was that the suspect was in the police station, and although he was not under "formal arrest," he predictably would have found himself moving from "constructive" to "actual" restraint if he had got up to leave the station without having his fingernail scrapings taken.

blood; it merely removes one constitutional objection to a search that is otherwise authorized by law. We have been presented with no information or argument on the issue whether police officers in Oregon are authorized by law to secure blood samples from a person who is suspected of driving while under the influence of intoxicants, and under what circumstances they may obtain such blood samples. This is the consequence of briefing search and seizure issues only from the United States Supreme Court's fourth amendment opinions downward, and not very far downward. *See State v. Greene,* 285 Or 337, 346-349 (concurring opinion).[5]

One might well wonder as a matter of Oregon law whether a legislature that has forbidden the administration of a mere breath test for alcohol over the driver's refusal has left the police free to take a person's blood for the same inquiry without his consent. *See* ORS 487.805(2). Perhaps there are other sources bearing on Oregon's public policy on the question of police authority to conduct body searches. Possibly the answer may differ whether the inquiry arises in enforcing the traffic laws, or the drug or liquor laws, or a homicide as in this case. These issues of police authorization have not been briefed, and the Court expresses no view on them. Nor are we likely to

---

[5] As Justice Lent and I there stated:

"Of course, the state and federal constitutions impose outer limits on the permissible range of authority to conduct searches and seizures, as today's cases show. But the constitutions neither grant such authority to anyone, nor prescribe who may exercise it, nor define the circumstances and manner in which, within those outer constitutional limits, the authority should or should not be employed. . . . When a court is called upon to decide only whether a particular search or seizure crossed the constitutional boundary, its decision marks only that boundary; it does not prescribe the law with respect to the officer's authority to conduct the search or seizure apart from that outer limit. Within this limit, the question of his authority is not a constitutional question but one of ordinary law.

. . . .

Of course, when an officer's act exceeds his legal authority, there is no occasion to consider its constitutionality. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977)." 285 Or at 346-347.

[258]

clarify them as long as cases with *"Schmerber*type" facts are briefed simply by matching them against the Supreme Court's constitutional opinion in *Schmerber v. California,*384 US 757, 86 S Ct 1826, 16 L Ed 2d 908 (1966) and other judicial opinions with similar facts, as if the public law of law enforcement in the several states were some kind of national common law.

Lent, J., joins in this concurring opinion.