Argued and submitted October 6, 1987, Court of Appeals and trial court affirmed
January 6, 1988

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LAWRENCE BRADLEY MILLIGAN,
*Petitioner on Review.*

(TC CR 83-775; CA A36635; SC S33581, S33944)

748 P2d 130

John Henry Hingson III, Oregon City, argued the cause and filed the petitions on behalf of the petitioner on review.

Jonathan H. Fussner, Assistant Attorney General, argued the cause on behalf of the respondent on review.

GILLETTE, J.

Lent, J., concurred and filed an opinion.

## GILLETTE, J.

This is a prosecution for criminally negligent homicide. We are called upon to determine the admissibility of blood samples extracted from a person suspected of committing a criminal offense relating to the consumption of alcohol, when the officer who requests the samples has neither a warrant nor the suspect's consent. In this case, two samples were drawn at an officer's behest, approximately one hour apart, and tested for alcohol content. Defendant moved to suppress the chemical analyses of the samples. The trial court denied defendant's motion, and he was convicted. The Court of Appeals affirmed. *State v. Milligan,* 84 Or App 743, 735 P2d 375 (1987). We also affirm.

Defendant drove a car into a power pole, killing his passenger. A witness at the scene of the accident, Todd Freeman, told the investigating officers that he, defendant and the deceased had been drinking together before the accident and that defendant and the deceased had six drinks each and were "smashed." Freeman, who had been following defendant in a second car, told the officers that defendant had been driving up to 90-95 miles per hour. The posted speed immediately before the accident was 25 miles per hour. A second witness, Tracy Marsh, arrived at the scene shortly after the crash. She told the officers that, immediately before the accident, she had seen two sets of headlights traveling at a high rate of speed past her.

Defendant was conscious. Officer Wilkerson detected a distinct odor of alcohol on his breath. (Officer Davis, who also was present, later testified that he noticed no sign that defendant was intoxicated.) At Wilkerson's direction, Davis transported defendant to the hospital, where he obtained the two samples of defendant's blood without defendant's consent. The second blood sample was drawn just over an hour after the first sample. Defendant was told that he had no choice but to accompany Davis to the hospital and to submit to the blood tests.

Defendant subsequently was charged with manslaughter in the first degree. ORS 163.118. He filed a pretrial motion to suppress the results of his blood test on the grounds, *inter alia,* that the police lacked probable cause to believe that he was driving while intoxicated, that he must be but was not

under a valid arrest when the blood samples were drawn without his consent, that the police lacked statutory authority to require him to submit to the blood tests and that a search warrant was required before the police could test the blood alcohol content of the samples. The motion was denied. The blood test results were admitted at defendant's trial, and he was convicted of criminally negligent homicide, a lesser included offense of the manslaughter charge. ORS 163.145.

The Court of Appeals initially reversed and remanded for a new trial holding that, under *State v. Langevin,* 78 Or App 311, 715 P2d 1355 (1986), the police were required to obtain a search warrant or to establish that exigent circumstances existed before testing defendant's blood samples for their alcohol content. In *Langevin,* the court had relied on its previous interpretation of Article I, section 9, of the Oregon Constitution in *State v. Westlund,* 75 Or App 43, 705 P2d 208 (1985).

This court subsequently reversed the Court of Appeals' decision in *Westlund. State v. Westlund,* 302 Or 225, 729 P2d 541 (1986). We also reversed and remanded *State v. Langevin* for reconsideration in light of *State v. Westlund, supra,* and *State v. Owens,* 302 Or 196, 729 P2d 524 (1986). On remand, the Court of Appeals affirmed the defendant's conviction in *Langevin. State v. Langevin,* 84 Or App 376, 733 P2d 1383 (1987). The state petitioned the Court of Appeals for reconsideration of the present case in light of this court's reversal in *Langevin.* That court granted the state's petition and affirmed defendant's conviction. *State v. Milligan, supra.* We allowed defendant's petitions for review to determine the circumstances under which the police may obtain blood samples, without a warrant or consent, from a person suspected of committing an alcohol-related crime.

■ Defendant invokes Oregon statutory law, the Oregon Constitution and the federal constitution in support of his contention that the blood samples should have been excluded. His primary objection is based on the theory that he was not under arrest when the blood samples were drawn.[1] That argu-

---

[1] Oregon law defines an "arrest" as follows:

" 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense.

ment is premised on the assumption that an arrest is a necessary prerequisite to the warrantless extraction of a blood sample based on probable cause. For the reasons that follow, we hold that the existence of an arrest is not relevant to an analysis of the permissibility of the warrantless extraction of a blood sample under Oregon statutes or either the state or the federal constitution.[2]

We turn first to the question whether Oregon statutory law authorizes the police to obtain a blood sample from a person suspected of an alcohol-related crime, without first arresting that person. The only Oregon statute that directly addresses police authority to obtain blood samples is found in the Implied Consent Law, ORS 813.100 - .320. Under ORS 813.140, a police officer is granted authority to obtain a chemical test of a suspect's blood for its alcohol content under the following circumstances:

"* * * A police officer may obtain a chemical test of the blood to determine the amount of alcohol in any person's blood * * * as provided in the following:

"(1) If, when requested by a police officer, the person expressly consents to such a test.

"(2) Notwithstanding subsection (1) of this section, from a person without the person's consent if:

"(a) The police officer has probable cause to believe that the person was driving while under the influence of intoxicants and that evidence of the offense will be found in the person's blood or urine; and

"(b) The person is unconscious or otherwise in a condition rendering the person incapable of expressly consenting to the test or tests requested."

---

A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest."

ORS 133.005(1).

The arresting officer must follow the procedures set out in ORS 133.235(3), which provides:

"The officer [making an arrest] shall inform the person to be arrested of the officer's authority and reason for the arrest, and, if the arrest is under a warrant, shall show the warrant, unless the officer encounters physical resistance, flight or other factors rendering this procedure impracticable, in which case the arresting officer shall inform the arrested person and show the warrant, if any, as soon as practicable."

[2] The trial court concluded that an arrest had occurred. It therefore did not fully analyze the theory on which we decide this case.

In this case, defendant was not unconscious or otherwise incapable of consenting to the blood test. The extraction and seizure of blood in this case therefore did not comply with the statute. Reading the statute by itself, one could fairly conclude that its provisions "occupy the field" and, therefore, the police either must obtain a sample in compliance with ORS 813.140, or the sample taken and any tests derived from it are not admissible.

However, the statute cannot be read alone. ORS 813.320 provides:

"The provisions of the implied consent law, except ORS 813.300 [not relevant here], shall not be construed by any court to limit the introduction of otherwise competent, relevant evidence in any civil action, suit or proceedings or in any criminal action other than a violation of ORS 813.010 [driving under the influence of intoxicants] or a similar municipal ordinance in proceedings under ORS 813.410."

Because the present case is not a prosecution for driving under the influence of intoxicants, ORS 813.140 does not require exclusion of the blood tests, even though they were not obtained according to the procedures set out in that provision. Thus, although there is no affirmative authorization of the procedure followed here, there is a legislative direction that the results of such procedure *shall be admissible,* assuming the results are relevant and competent. We therefore hold that defendant's statutory argument is not well taken.

We turn now to an examination of whether the manner of taking the blood samples in this case complied with state and federal constitutional requirements. The extraction of a blood sample by the police is both a search of the person and a seizure of an "effect"—the person's blood. Thus, the extraction implicates constitutional guarantees against unreasonable searches and seizures in Article I, section 9, of the Oregon Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution.[3] *Schmerber*

---

[3] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be

*v. California,* 384 US 757, 767, 86 S Ct 1826, 16 L Ed 2d 908 (1966); *see also State v. Heintz,* 286 Or 239, 594 P2d 385 (1979).

■    Defendant first argues that the police did not have probable cause to believe that an analysis of his blood would yield evidence that he had committed an alcohol-related crime. We disagree. The circumstances surrounding the accident, the odor of alcohol on defendant's breath and Freeman's statement that defendant had been drinking heavily were sufficient to establish probable cause.

The remaining question is whether the police were required to obtain a warrant before requesting hospital personnel to draw samples of defendant's blood. Defendant argues that the extraction of blood in this case cannot be justified either as a search incident to a lawful arrest or as a warrantless search and seizure justified by exigent circumstances.

■    We think defendant's argument about arrest misses the point, at least under the Oregon Constitution. Whether or not defendant had been "arrested" by the officer who accompanied him to the hospital, he certainly had been "seized" for the purposes of Oregon Constitution Article I, section 9. Under the Oregon Constitution, therefore, the issue is whether the officer's seizure of defendant and participation in the extraction of his blood met constitutional requirements.

They did. When he was seized, the officers had probable cause to believe that defendant was a vessel containing evidence of a crime he had committed—evidence that was dissipating with every breath he took. *See State v. Heintz, supra,* 286 Or at 248, 249. Warrantless seizure and search

---

seized."

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Section 1 of the Fourteenth Amendment to the United States Constitution provides, in part:

"No State shall make or enforce any law which shall * * * deprive any person of life, liberty, or property, without due process of law * * *."

under such circumstances therefore is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence. *See, e.g., State v. Matsen/Wilson,* 287 Or 581, 584, 601 P2d 784 (1979).

■　In order to determine accurately the level of alcohol in a suspect's blood at the time of the alleged crime, the police must obtain an initial sample of the suspect's blood with as little delay as possible. Testimony at the hearing on defendant's motion to dismiss established that alcohol dissipation rates vary from person to person. To determine the dissipation rate of any particular individual, it is necessary to take more than one blood sample. A nurse at the hospital testified that the "usual practice" was to draw the blood samples one hour apart. Thus, the first blood sample must be drawn early enough so that a measurable amount of alcohol will still be present in the suspect's blood an hour later. This evidence established that exigent circumstances existed justifying the warrantless extraction of at least the initial blood sample, so long as the extraction was made promptly after the suspect was taken to a place where it could be made. He was taken to such a place in this case. No warrant was required for the initial testing of defendant's blood.[4]

■　Before this court, however, defendant argues for the first time that, even if exigent circumstances were present at the time that the first blood sample was drawn, the state did not prove that the police could not have obtained a telephonic warrant before drawing the second sample. *See* ORS 133.545(5); 133.555(3). In the trial court, defendant argued that the police should have obtained a warrant before ordering hospital personnel to draw *any* blood. The argument focused on the period of time preceding the first blood test.[5] Defendant

---

[4] Although we are not required to so conclude in this case, we note that an argument can be made that the legislature has already declared that the existence of alcohol in the blood of a criminal suspect creates a *per se* exigency. The assumption underlying both the implied consent law, ORS 813.100 - .130, and the chemical test of the blood statutes, ORS 813.140 - .160, is that blood alcohol dissipates, it must be tested as soon as practicable and a warrant is not required, but alternative procedures reasonably calculated to insure the accuracy of the tests and consistent with the rights of the accused must be followed.

[5] The trial court held that no exigent circumstances existed *vis-a-vis* the initial extraction of blood because no evidence showed the amount of time that would have been lost in obtaining a warrant. As we have already noted, this legal conclusion asks too much of the evidence. From the testimony the trial court accepted, exigent circumstances existed justifying the initial, warrantless extraction because alcohol was dissipating *at some significant rate.*

did not then argue that the police should have sought a warrant during the hour separating the first and second tests. The state, therefore, did not have a reasonable opportunity to produce evidence justifying the failure of the police to obtain a warrant during that hour. Because the issue was not properly presented to the trial court, we shall not address it on review.

We find no violation of the Oregon Constitution.

Defendant's claims under the United States Constitution fare no better. In *Schmerber v. California, supra,* the defendant was arrested at a hospital where he was being treated for injuries sustained in an automobile accident. After arresting the defendant, the investigating officer directed hospital personnel to draw a sample of the defendant's blood. The Supreme Court held that the warrantless extraction of the blood sample was reasonable under the Fourth Amendment. The Court recognized that the police have the authority to search a lawfully arrested person for evidence or concealed weapons. However, it rejected the notion that the mere fact of arrest could justify so intensive a search:

> "Whatever the validity of these considerations [justifying searches incident to arrest] in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." 384 US at 769-70.

Thus, as a matter of Fourth Amendment law, the *Schmerber* Court concluded that the warrantless extraction of blood from a suspect never can be justified solely as a search incident to the suspect's arrest.

The *Schmerber* Court went on to hold that, because of the evanescent nature of alcohol in the blood, the police were justified in drawing the blood sample without first obtaining a search warrant. The Court also concluded that the test chosen to measure the defendant's blood alcohol content was reasonable and that it was performed in a reasonable manner, *i.e.,* "by a physician in a hospital environment

according to accepted medical practices." 384 US at 771. The Court concluded that, "[g]iven these special facts, * * * the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." *Id.*

We emphasize that, although the *Schmerber* Court referred to the search as "incident to petitioner's arrest," its holding did not turn on the existence of an arrest. Rather, the Court relied on the exigency created by the evanescent nature of blood alcohol and the danger that important evidence would disappear without an immediate search.

The Court later applied the exigent circumstances rationale in a case that did not involve an actual arrest under Oregon law. In *Cupp v. Murphy*, 412 US 291, 93 S Ct 2000, 36 L Ed 2d 900 (1973), Murphy had voluntarily presented himself at a police station to discuss the strangulation death of his wife, which had taken place earlier that evening. Shortly after Murphy arrived at the police station, a police officer noticed a dark spot resembling dried blood on Murphy's finger. The officer, remembering that the victim had lacerations on her neck and knowing that evidence of strangulation frequently can be found under the perpetrator's fingernails, asked Murphy for a sample of scrapings from his fingernails. When Murphy declined, the police took a sample of his fingernail scrapings over his protest and without a warrant. The scrapings contained traces of the victim's skin and blood, and fabric from her nightgown. The evidence was admitted at Murphy's trial, and he subsequently was convicted of murder.

The Supreme Court held that the warrantless seizure of Murphy's person and the search of his fingernails was permissible under the Fourth Amendment. The Court first noted that the brief detention of Murphy against his will was a "seizure" implicating the Fourth Amendment guarantee against unreasonable searches and seizures. Because the police had probable cause to believe that Murphy had committed the murder, and thus had probable cause to arrest Murphy, the seizure was justified. 412 US at 294-95.

More problematic was the warrantless search of Murphy's fingernails for incriminating evidence. In upholding the search, the Court relied on the principles underlying cases involving warrantless searches incident to arrest. In such cases, the fact of arrest motivates the arrested person to take

immediate steps to destroy any incriminating evidence on his or her person. An arrest thus creates a type of exigency justifying a warrantless search of the arrested person for, *inter alia,* evidence that he or she has committed a crime.

In *Cupp v. Murphy,* however, Murphy had not been "arrested" as that term then was defined by Oregon law.[6] Nonetheless, the police officer's question "sufficiently apprised [Murphy] of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention." 412 US at 296. The evidence under Murphy's fingernails, moreover, was readily destructible. The exigency created by the destructibility of the evidence, coupled with Murphy's motivation to destroy the evidence, justified a warrantless search for the very limited purpose of preserving the evanescent evidence. *Id.*

▉ ▉ From a fair reading of *Murphy* and *Schmerber* together, we conclude that it is the evanescent nature of the evidence sought, not the existence or absence of an arrest, that constitutionally justifies the kind of action taken by the officers in this case. We hold that, under the federal constitution, an arrest as defined in statutory law is not required prior to the warrantless extraction of blood for the purposes of determining blood alcohol content, so long as the extraction is based on probable cause sufficiently strong to have justified such an arrest. Defendant's arguments to the contrary are wrong.

In so holding, we note that in *United States v. Harvey,* 701 F2d 800, 803 (9th Cir 1983), on which defendant relies, the United States Court of Appeals for the Ninth Circuit adopted a contrary view. Relying on *Schmerber v. California, supra,* that court held that a formal announcement of arrest is required prior to, or substantially contemporaneous with, the taking of a blood sample without the subject's consent. As we have previously discussed, *Schmerber* did not hold that an arrest was a necessary prerequisite to the taking of a blood sample. The *Harvey* court attempted to bolster its conclusion with the following reasoning:

"Requiring an actual arrest prior to the removal of a blood

---

[6] *Former* ORS 133.210 defined an arrest as "the taking of a person into custody so that he may be held to answer for a crime."

sample will not place an undue burden on police. If placing a suspect under arrest is but a 'silly formality,' as the United States argues in *Harvey,* there is no reason why the police cannot take the time to engage in this ritual prior to taking the sample. Placing the suspect under arrest will help ensure that the police do not arbitrarily violate an individual's privacy. Also, it will sharply delineate the moment at which the police officer determined he or she had probable cause to arrest. In this respect, it will help prevent an after-the-fact justification of the seizure of the suspect and the blood. * * * Furthermore, the formal announcement of arrest triggers certain responsibilities for the arresting officer and gives rise to certain rights for the accused; for example, those rights delineated in a proper *Miranda* warning." 701 F2d at 805 (citation omitted).

■    The difficulty with the *Harvey* court's approach is that it substitutes an incantation of the words of an arrest for the far more substantive value of assuring that, whatever the officers said, they had probable cause sufficient to justify arresting the criminal defendant and invading his body. If the rule in *Harvey* is intended to ensure that police officers analyze the circumstances in each case and consciously conclude that probable cause exists to arrest an individual for an alcohol-related crime before such an intensive search occurs, a formally stated arrest is not the only mechanism that will trigger such an analysis. The police may not restrain a suspect and draw blood from his or her body without probable cause to believe that the suspect. has committed an alcohol-related crime and that analysis of a blood sample will yield evidence of that crime. The officers in this case knew that; both testified as to what they considered the circumstances to be and as to why they concluded that probable cause existed in this case. An announced arrest would do nothing to enhance the factual predicate for their actions, much less prevent arbitrary violations of privacy or after-the-fact justifications. Moreover, it is not clear what "rights" and "responsibilities," in the Ninth Circuit's view, are triggered by a formal announcement of arrest, because it does not mention any except the "rights delineated in a proper *Miranda* warning." Those rights are irrelevant to this inquiry. *Schmerber v. California, supra,* 384 US at 760-65.

Our view of this issue finds support in 2 LaFave,

Search and Seizure § 5.4(b)(1978). On pages 343-44 of that volume, the author states:

"Although this same result [requiring an arrest before searching a suspect's person] has been reached by other courts, the better view is to the contrary, namely, that a 'warrantless search is proper if the officer had probable cause to believe that a crime had been committed and probable cause to believe that evidence of the crime in question will be found' and that 'an immediate, warrantless search is necessary in order to * * * prevent the destruction or loss of evidence.' Indeed, the case for permitting a taking of the blood sample upon probable cause that the defendant is intoxicated without first arresting him is, if anything, stronger than the case for the searches conducted in [*Murphy v.*] *Cupp* and *Franklin* [*v. State,* 18 Md App 651, 308 A2d 752 (1973)(seizure of rape suspect's undershorts)]. In the blood sample case, as opposed to those cases, there is no room whatsoever for the argument that the lack of a formal arrest may decrease somewhat the chances that the evidence will be destroyed, for the 'evanescent' character of the evidence is inherent in its nature and does not depend upon any motive of the defendant to destroy it. That is, the need for the blood sample arises out of the fact, as stated in *Schmerber v. California,* 'that the percentage of alcohol in the blood begins to diminish shortly after drinking stops,' an emergency which is in no way affected by whether or not the defendant has been formally arrested. It is the height of formalism, to say the least, to suggest that a warrantless search on probable cause in order to meet this emergency is reasonable only if the police first declare the hospitalized defendant under arrest. In particular, it 'would be ridiculous to require a police officer to perform some formal ritual of arrest over the unconscious body of a critically injured person who was a party to a fatal automobile accident.' The claim that the contrary position 'provides some measure of assurance that probable cause is based upon considerations independent of the blood-alcohol test results' is untenable, as the need for a court to determine that probable cause existed prior to the test is present under either rule." (Footnotes omitted.)

Although the examples cited by LaFave involve defendants who are unconscious or hospitalized, there is no principled basis for restricting the rule we announce today to those situations. *See State v. Heintz, supra,* 286 Or at 257 (Linde, J., concurring). The constitutionality of defendant's blood test under the federal constitution does not depend

upon whether or not he was arrested at the time his blood was drawn.

The decisions of the Court of Appeals and the trial court are affirmed.

**LENT, J.,** concurring.

I concur, but I add this short opinion concerning the definition of "arrest." *See* 304 Or at 662-63 n 1.

Prior to the revision of the criminal procedure code by the 1973 legislature, the definition of "arrest" was found in *former* ORS 133.210:

> "Arrest is the taking of a person into custody so that he may be held to answer for a crime."

Another section, *former* ORS 133.250, fleshed out the definition as follows:

> "An arrest is made by an actual restraint of the person of the defendant or by his submission to the custody of the officer."

The genesis of these sections is to be found in the Code of Criminal Procedure, General Laws of Oregon, chapter 36, sections 360 and 364, p 504 (Deady 1845-1864), and they were perpetuated through various revisions of the state statutes to and including Oregon Revised Statutes.

There is nothing in those former sections to indicate that they did not apply to the entire set of statutes of this state.

Between the 1971 and 1973 sessions of the legislature, the Criminal Law Revision Commission developed a draft of a revised code of criminal procedure. The Commission's Final Draft (1972) contained an Article 4 entitled "ARRESTS AND RELATED PROCEDURES." Section 89 of that article provided:

> "As used in this Article, unless the context requires otherwise:
>
> "(1) 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging him with an offense. A 'stop' as authorized under sections 30 to 32 of this Act is not an arrest."

The commentary explained that the proposed definition of

"arrest" combined the prior two existing statutes, *former* ORS 133.210 and 133.250. The commentary does not explain why the definition was limited to use in Article 4.

Legislative action on the Commission's work resulted in the enactment of Oregon Revised Statutes, chapter 133, entitled: "Arrest and Related Procedures; Search and Seizure; Extradition." ORS 133.005 was enacted as part of that chapter and provided (as it substantially does now):

"As used in ORS 131.655 and 133.005 to 133.450, unless the context requires otherwise:

"(1) 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging him with an offense. A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest."

The sections of chapter 133 relating to "Search and Seizure," namely, ORS 133.525 to 133.730, are not sections to which the definition in ORS 133.005 is applicable.

I have not made further inquiry into Commission or legislative history to attempt to discover why the definition of "arrest" does not apply to the statutes on search and seizure because no party has raised any issue that requires such inquiry. I note this only to express a caveat to the lead opinion's use in footnote 1 of only part of ORS 133.005 to express a definition of "arrest." There may someday be a case in which it is important to note the legislature's action in limiting the scope of the definition of "arrest."