# STATE OF OREGON,
*Respondent,*

*v.*

# CLAYTON C. LOVELL,
*Appellant.*

(88-04-1312; CA A50943)

783 P2d 1040

George W. Kelly, Eugene, argued the cause and filed the brief for appellant.

Janet Klapstein, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendant appeals a conviction for theft in the first degree. ORS 164.055. He argues that the trial court erred in denying his motion to suppress, because a deputy sheriff entered into his corral, seized a calf and then administered a "mothering test" without a search warrant and in the absence of exigent circumstances. We affirm.

On March 7, 1988, a calf was born on a ranch owned by Harris. Two days later, Harris noticed that the calf was gone. As a result of a conversation with a neighboring rancher, Harris went to defendant's ranch to investigate. While Harris was driving to the ranch, defendant passed him going the opposite direction. Defendant appeared to be taking a load of hay to town, an activity from which he usually would not return until 2:30 or 3:00 p.m. Harris entered defendant's ranch and saw what he believed to be his calf in one of the corrals. At 9:44 a.m., Harris phoned the sheriff's office to report what he believed to be a theft. Deputy Jett responded to the call and arrived at the Harris ranch at approximately 11:00 a.m. Jett and Harris decided to transport the calf's purported mother to defendant's ranch to determine whether the calf would suckle from Harris' cow.

Thereafter, as the trial court found:

"After checking the house and finding no one home, Jett proceeded about 200 yards to [defendant's corrals]. He immediately separated the calves from the heifers. The brown calf claimed by Harris had been sucking defendant's heifer, milk and slobber visible on the calf.

"Then, Harris arrived with his cow. Harris' heifer cow was placed with the three heifers. The calves and the heifers were then mixed. Two of the calves immediately mothered to defendant's heifers. The brown calf went to both heifers, the Harris heifer, and defendant's heifer. Then the participants drove away the heifers, and the calf elected to go with the Harris heifer.

"* * * * *

"It took Jett about an hour of driving time from Enterprise to the Harris ranch. Jett was in a hurry to do the 'mother testing.' Jett knew that a drive to Enterprise to obtain a warrant would take approximately three hours. Jett could not get out of the Imnaha Canyon on his police radio.

"Jett was the only deputy on duty that day. * * * Whenever a sheriff's car appears in the Imnaha Canyon, the news spreads quickly via the telephone and otherwise. Jett never considered obtaining a search warrant until well after the search had been initiated, when he was videotaping the cattle and the Lovell Ranch. * * *

"In response to a hypothetical question, Wayne Cook, an experienced cattleman, given the facts of the case, 36 hours with a natural mother and 36 hours with a surrogate mother, stated that time was of the essence in administering the mothering test. With the passage of time, mothering becomes more difficult and the test less indicative of the actual situation. To be contrasted is the weaning of a calf that has been with its mother for eight or nine months. * * *

"* * * * *

"Here, Jett was deep in the Imnaha Canyon without radio transmission and without other law enforcement officers. His presence at defendant's home would soon be known throughout the Canyon. He was considerable distance from a public phone at the Imnaha store. It was vital, under the peculiar facts of this case, that the mothering test be swiftly applied. The defendant was gone, but could return at any time. Given this, it was necessary to proceed and administer the test on the spot and without a search warrant."

Defendant argues that Jett's entry into his corral and seizure of the calf without a search warrant were unlawful. *See State v. Dixon/Digby*, 307 Or 195, 212, 766 P2d 1015 (1988). Defendant's corral was adjacent to his residence. To reach his residence from the public road, one must travel a mile-long private road, which is shared by a neighbor. As the road approaches defendant's residence, it forks, with one fork going to the residence and the other to a gate. The corrals are 200 yards from the house and 150 yards beyond the gate. The land on which the corral stood was land in which defendant had manifested every intention to exclude the public.

Defendant argues that, because Jett's entry into the corral was without a warrant, the evidence that resulted from the "mothering test" should have been suppressed. He concedes that it would have taken at least six hours to drive to LaGrande, to draft an affidavit, to find the persons necessary to authorize a search warrant and to return to defendant's ranch. However, he asserts that the state failed to prove that the possibility of obtaining a telephonic warrant was excluded.

*See* ORS 133.545(5).[1] Defendant points out that Jett could have sought a warrant by making a telephone call to a magistrate from Enterprise before he left for the Harris ranch, or while at the Harris ranch, or at the Imnaha store some six miles from defendant's ranch.

The state argues that Jett's actions were justified by exigent circumstances.[2] It points out that a proper search warrant must describe the item to be seized as well as the location to be searched and that it was not unreasonable for Jett to go to defendant's property to confirm the animal's presence and to seek consent to perform the "mothering test."

When Jett arrived at defendant's ranch, he saw the calf for the first time.[3] He first went to defendant's residence to see if defendant was home. Had defendant been home, Jett could have demanded that he produce the calf pursuant to ORS 607.350. By that time, the calf, if it had been stolen, had spent 36 hours with its natural mother and 36 hours with its surrogate mother. Jett had been told before he left Enterprise that, with the passage of time, the test was less indicative of whether the calf belonged to the mother. He had also been told that the calf's purported mother was a heifer, which, because the calf was her first, would rapidly lose her ability to recognize her calf by scent. Also, evidence was presented that, if a calf consumes milk from a surrogate mother, the scent of the calf will change and impair recognition.

We cannot say that the trial court erred in finding that, by the time Jett had obtained a telephonic warrant and

---

[1] There is no evidence in the record as to the availability of a telephonic warrant. The issue was first raised by defense counsel on closing argument on the motion to suppress. Parties must make an evidentiary record to support arguments. Telephonic warrants should be considered whenever feasible. *See State v. Jordan,* 73 Or App 84, 697 P2d 1004, *rev den* 299 Or 251 (1985).

[2] In support of its argument the state points to ORS 607.350, which provides:

"The person, separating calves or colts from their mothers shall, upon demand of the sheriff, inspector or other officer, produce, within a reasonable time, the mother of each such animal, so that the interested parties may ascertain if the animal, so produced as the mother thereof, does or does not claim or suckle such calf or colt."

It does not argue that ORS 607.350 supersedes defendant's privacy right, but does argue that ORS 607.350 entitled the state to attempt to implement the statute before it sought a warrant.

[3] Jett was able to see the calf from the driveway leading to defendant's house.

returned, the "mothering test" would have been inconclusive. Under the circumstances, the exigency of the situation permitted a search and seizure without a warrant. *See State v. Milligan,* 304 Or 659, 666, 748 P2d 130 (1988).

Affirmed.